# United States Court of Appeals
## For the First Circuit

No. 08-2134

LPP MORTGAGE, LTD.,

Plaintiff, Appellant,

v.

LEONARD SUGARMAN,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Boudin, John R. Gibson,[*] and Howard,
Circuit Judges.

Christopher P. Litterio with whom Michael J. Duffy and Ruberto, Israel & Weiner, P.C. were on brief for appellant.
Daniel J. Murphy with whom Stanley W. Wheatley and The Murphy Law Group, LLC were on brief for appellee.

May 7, 2009

---

[*]Of the Eighth Circuit, sitting by designation

**BOUDIN**, <u>Circuit Judge</u>.  The facts underlying this appeal date back to 1975, when the Small Business Administration ("SBA") loaned $4 million, evidenced by a promissory note, to Statler Industries, Ltd. ("Statler"), an Augusta, Maine, based paper manufacturer.  To secure the loan, the SBA received a first priority mortgage on the Statler plant site, a first priority security interest in almost all the company's equipment and machinery and a personal guaranty of the loan from Leonard Sugarman, then Statler's president and a major shareholder.

Sugarman's attorney, Harris Baseman, was able to modify slightly the standard guaranty required by the SBA; with SBA's consent the word "LIMITED" was added to the title of the preprinted SBA form and an additional sentence--"This guaranty is limited to 60.1% of the outstanding loan balance"--was added to the bottom of the preprinted form.  The guaranty did not require the SBA to exhaust its collateral before turning to him; Sugarman sought unsuccessfully to secure such a limitation but the SBA refused to modify its boilerplate.

In 1980, the firm's finances were in good shape, and Sugarman not only renewed his prior request that the SBA agree to liquidate collateral before he was held personally liable, but also asked to have the guaranty limited to $500,000.  With the SBA's agreement Baseman had the following two sentences typed at the bottom of the guaranty form before it was re-executed:

> This guaranty is limited to the deficiency
> existing after sale of corporate assets
> securing the subject loan. The guaranty is
> further limited to an amount not to exceed
> Five Hundred Thousand Dollars.

At the SBA's insistence, the preprinted language was not altered. Thus, inconsistent with the new first sentence of the added language, boilerplate language in the form continued to allow the SBA to demand payment from Sugarman without first exhausting the collateral.

Also left undisturbed was boilerplate language granting the SBA "full power, in its uncontrolled discretion and without notice to [Sugarman]" to take any action it deemed fit with respect to the collateral. The form provided the SBA could "deal in any matter" with the collateral, including:

> [T]he substitution, exchange, or release of
> all or any parts of the collateral, whether or
> not the collateral, if any, received by Lender
> upon any such substitution, exchange or
> release shall be of the same or a different
> character or value than the collateral
> surrendered by Lender.

The new 1980 guaranty, executed by both sides, is agreed to have supplanted the original guaranty.

In 1994, Statler defaulted in its payments on the SBA loan. The SBA then demanded payment of the outstanding balance ($1.277 million plus interest) and, unable to pay, Statler filed for chapter 11 bankruptcy. In 1996, with the bankruptcy court's assent, Statler sold its assets to Tree-Free Fiber Co., LLC., which

-3-

assumed Statler's obligations under the SBA loan. Sugarman consented to the assumption, reaffirmed his guaranty, and agreed that "Tree-Free [could] sell machinery or equipment with an aggregate value up to $25,000 per year" without SBA consent.

To carry out its purchase of Statler's assets, Tree-Free received a $6 million loan from a supplier, Thermo Fibertek, Inc. The loan was given pursuant to a subordination agreement, which granted Thermo Fibertek the first security interest in certain machinery and equipment that had previously been subject to the first priority claims of the SBA. Both the SBA and Sugarman gave their consent to this subordination.

The following year, Tree Free needed additional financing to upgrade its facilities and sought a loan from KeyBank, N.A. To help Tree Free to secure the loan, the SBA agreed with KeyBank that the SBA would give up its first priority on certain of the mortagaged real estate and its first priority security interest in certain of the machinery and equipment that backed the promissory note. Sugarman was apparently not told of the transaction and he did not give consent to the SBA's release of its priority positions.

At the time, Philip Proulx, then the SBA's chief of portfolio management, expressed concern in a letter to Tree Free executives about the proposal that the SBA enter into the release. Proulx said that if it subordinated its position and the business

-4-

were to fail, Sugarman would remain liable under the guaranty but without the protection provided by the SBA's first claim on the released real estate and equipment.[1] Nevertheless, the SBA took the view that it was entitled to release the collateral without Sugarman's consent and ultimately did so.

In December 1997, Tree Free defaulted on the loan from KeyBank and the Maine Superior Court placed Tree Free into receivership. Tree-Free's assets were sold; with its reduced security position, the SBA received only $350,000 of the $3.5 million the sale generated. As a result, the SBA was left with a deficiency on its original loan to Statler in the amount of $284,688.71, plus additional interest that had accrued.

The SBA demanded under the 1980 guaranty that Sugarman pay the deficiency. Sugarman denied liability, contending that the SBA had violated its obligations to him by releasing its first priority security interests without his consent. The loan was

---

[1]The letter stated, in relevant part:

I would like to point out that considerations other than credit enter our deliberations. We currently have the personal guaranty of the former principal of Statler, which is not now at risk of being called upon, but, which will be if we enter the proposed pari passu arrangement and the business fails. Although our documentation allows us to take actions we consider prudent and in the best interest of SBA without consent of the guarantor, we have a moral obligation to consider the effects of our action on that individual. Additionally, should we agree to enter agreements which place him at risk of personal loss, we would anticipate litigation....

eventually purchased from the SBA by LPP Mortgage Ltd. ("LPP"); standing now in the SBA's shoes, LPP commenced this law suit in federal district court in Massachusetts to recover the deficiency remaining on the loan to Sugarman.

In the district court, both parties moved for summary judgment and the district court denied both motions. In doing so, the court found that the SBA was required under the guaranty to exhaust whatever collateral it had before turning to Sugarman as a guarantor. Although (as noted above) boilerplate language provided otherwise, the district court found the typewritten sentences added in 1980 overrode the boilerplate language in this respect.

However, the modified guaranty by its terms only required the SBA to exhaust its collateral ("This guaranty is limited to the deficiency existing after sale of corporate assets securing the subject loan."). The district court found it less clear whether the SBA was entitled to release collateral in 1997 without Sugarman's consent. It therefore conducted a two day bench trial, hearing extrinsic evidence of the parties' intent. Proulx, Sugarman and Baseman all testified.

Proulx testified that, consistent with his letter, he believed the typewritten text had no impact on the SBA's rights to subordinate its collateral. Sugarman and Baseman both testified that they understood the language inserted in 1980 to protect Sugarman's interest in having the collateral available and that its

release without his consent was inconsistent with this understanding. Ultimately, the district court found that Sugarman's consent was required and it dismissed LPP Mortgage's claim.

The gist of the district court's decisions--one denying summary judgment to LPP and the other deciding against it on the merits after trial--was as follows: that the guaranty as amended by the additional sentences was ambiguous as to whether the SBA could without Sugarman's consent subordinate its first priority in the collateral so that extrinsic evidence was proper; and, based on the testimony and the parties' dealings, Sugarman's answer--that the SBA could not do so--was persuasive.

LPP has appealed, urging various errors; the standard of review in this court varies with the claim of error. Broadly, issues of law are reviewed de novo, Carr v. PMS Fishing Corp., 191 F.3d 1, 5 (1st Cir. 1999), and fact findings at a bench trial for clear error, Principal Mut. Life Ins. Co. v. Racal-Datacom, Inc., 233 F.3d 1, 3 (1st Cir. 2000); but several judgment calls arguably fall somewhere in between these poles. The case is not hard to analyze but several of the issues are very close calls.

We start with choice of law which, happily, turns out not to matter. In the district court, LPP claimed that Massachusetts law governed, while Sugarman thought Maine law controlled. They agreed, however, that there were no substantive differences between

the two states as to the relevant contract rules and the district court applied a hybrid of the two. Neither side complains about this approach on appeal, and we mention it only because both sides were probably wrong.

Because the guaranty is a contract between a private party and an agency of the United States, it appears likely that federal common law governs as to contractual issues, 13 C.F.R. § 101.106(b)(2) (2009), borrowing from state law where appropriate and consistent with federal interests. In some situations, federal common law might give the government an edge; but often ordinary contract principles apply and no one argues otherwise here.

LPP argues first that the district court erred in finding the guaranty ambiguous and conducting a trial on extrinsic evidence; specifically, evidence of course of dealing, the context in which the typed amendment was agreed to, and the parties' intentions as to the overriding of boilerplate. Whether a contract is ambiguous is a question of law and our review of the district court's ruling on that issue is plenary. ITT Corp. v. LTX Corp., 926 F.2d 1258, 1261 (1st Cir. 1991).

LPP's position is not frivolous, and 50 years ago many courts would readily have endorsed it, at least so far as concerns the SBA's right to dispose of collateral without Sugarman's consent. E.g., Burlee Dry Dock Co. v. Besse, 130 F. 444, 445-46 (1st Cir. 1904). But the tendency of the courts has been to soften

the rigor of the classic doctrine that extrinsic evidence cannot be admitted to override plain language.  2 Farnsworth on Contracts § 7.12, at 314 (3d ed. 2004); see also Donoghue v. IBC USA (Publications), Inc., 70 F.3d 206, 215 (1st Cir. 1995).

The thin edge of the wedge was the view, now quite common, that extrinsic evidence can be offered to show that seemingly plain language, in the circumstances, conceals an ambiguity.[2]  From there, it is not a long leap to a "peek" at extrinsic evidence even where it does not focus directly on "ambiguity."  Bank v. Int'l Bus. Mach. Corp., 145 F.3d 420, 424 n.2 (1st Cir. 1998).  How far to go is not clearly settled and perhaps cannot be reduced to formula.  See Nat'l Tax Inst., Inc., 388 F.3d at 20 (stating that it may be permissible to look to extrinsic evidence where "language may point only slightly in one direction and extrinsic evidence strongly in another").

As it happens, the ambiguity here is in part very much on the surface.  Compare Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274 (2d Cir. 1989).  LPP is right that the provisions on which it relies do not in the strictest sense conflict with the added sentences.  The former give the SBA broad authority to

---

[2]Courts may look at extrinsic evidence for the "very purpose of deciding whether the documentary expression of a contract is ambiguous," Donoghue 70 F.3d at 215, for there is the real possibility that "extrinsic evidence may in fact reveal an ambiguity not otherwise patent." Nat'l Tax Inst., Inc. v. Topnotch at Stowe Resort & Spa, 388 F.3d 15, 20 (1st Cir. 2004).

dispose of collateral without notice to Sugarman or his consent; the added language literally read merely requires resort first to whatever collateral the SBA has if and when it seeks to recover from Sugarman.

But the added wording squarely conflicts with boilerplate language saying that the SBA need not exhaust collateral before turning to Sugarman, and this language was <u>not</u> deleted when the addendum was added. So something is amiss. And, while one can argue that the conflict is only between this latter boilerplate provision and the added language, the provisions relating to collateral are functionally interrelated and Sugarman now has a plausible argument for looking behind plain wording to see just <u>how far</u> the parties intended to repeal the relevant boilerplate.

Sugarman also has two pieces of extrinsic evidence, short of testimony about the parties' intent, that might be can openers for direct testimony on that subject. The first is that the SBA did seek Sugarman's consent in 1996 when it was agreed that Tree-Free would receive Statler's assets. Course of conduct testimony, for obvious reasons, troubles courts less than other testimony, and is widely considered. <u>See</u> 2 <u>Farnsworth on Contracts</u> § 7.13 (detailing importance of course of dealing and performance in contract interpretation).

The other piece of concrete extrinsic evidence is Proulx's letter expressing concerns when the SBA agreed with

KeyBank to surrender SBA's first priority rights. It is true that Proulx was not part of the 1980 negotiations and spoke only of a moral and not a legal commitment; but it reinforces the connection between the exhaustion obligation and the importance of maintaining the collateral intact. Both the letter and the 1996 consent, although less weighty than might appear, reinforce the court's finding of ambiguity.

This brings us to the merits on the premise that all of the evidence may be considered which, as LPP framed its appeal, present a series of issues: whether the district court misstated the burden of proof, whether it matters, whether the evidence supports the court's findings, whether the facts found support the court's ultimate determination that the SBA breached its obligations, and whether Sugarman proved injury from such a breach. The issues are curiously entangled.

The district court arguably did, as LPP argues, misstate the allocation of burdens of proof, due partly to a confusing colloquy with counsel. LPP, as the party suing on a contractual guaranty, had to prove the guaranty, the failure to recover on the note and the sum remaining unpaid. Transmedia Rest. Corp. v. Elegant Appetites, Inc., No. 243682, 2000 WL 1616462, at *3 (Mass. App. Div. Oct. 20, 2000). But most of this was straightforward and Sugarman's liability turned, primarily, on whether the SBA was

obliged to get his consent before releasing the collateral--which admittedly it did not do.

The district court said that "the parties agreed during the trial that plaintiff bears the burden of proving the parties' intent in 1980" and it found that while Sugarman had introduced intent evidence from him and Baseman; LPP--according to the district judge--"failed to meet its burden for the simple reason that it failed to proffer any evidence of the SBA's intentions in 1980"--Proulx having not been involved in the revision and offering only his own later view of SBA obligations.

LPP argues persuasively that it made no such general concession. The pertinent exchanges confirm that LPP twice told the district judge that it bore the burden of showing a contract and its breach but that, to the extent that Sugarman claimed that he was excused from performance because of a breach by SBA of an obligation under the guaranty to get his consent, this was an affirmative defense on which he bore the burden.[3] This may well be the better view of the law. Cf. Fed. Deposit Ins. Corp. v. Elder Care Servs., 82 F.3d 524, 526 (1st Cir. 1996).

After all, Sugarman claims that the guaranty required his consent to the SBA's disposal of collateral: he does not say that

---

[3]The two exchanges, occurring at different times during the trial, are reprinted in an addendum and, in the second one, the district judge acknowledges that this is LPP's position. Sugarman's brief does not effectively respond.

the language explicitly required it but that it was implicit in the amendment. It follows that Sugarman would have to show that such a provision implicitly existed and that the explicit boilerplate to the contrary had been implicitly disregarded. Whether or not one calls this an affirmative defense, it feels like something that Sugarman would normally have to show--absent an LPP concession which we think is absent.

But, despite the district court's "simple reason" statement quoted above, it is clear to us that the burden allocation made no difference to critical factual findings. Sugarman and his lawyer both testified as to their understanding of the contract and the district court credited their testimony; the SBA offered no direct evidence of the understanding of SBA officials involved in the 1980 adjustment; and the limited circumstantial evidence supporting Sugarman is undisputed. See Restatement (Second) of Contracts § 202 cmt. g (1981) ("The parties to an agreement know best what they mean").

Burden might matter if no witnesses had testified or the inferences were in perfect equipoise, but given that the district court heard and believed Sugarman, the raw facts are simply not in dispute. And here the issue is readily framed but not easily answered: is it permissible to move from a solid finding that Sugarman and his lawyer understood the contract to embody a consent

-13-

requirement to the more debatable conclusion that the contract should be so interpreted?

After all, Sugarman did not claim that any SBA representative shared his understanding and so conceded; he testified that because the amended language was designed to give him the protection of the collateral, it followed that the SBA could not release the collateral without his consent. This is not necessarily an unreasonable inference on his part; but the SBA, if it thought at all, could have thought that at most it had to behave reasonably as to the collateral--not that it needed Sugarman's consent.[4]

But even if the SBA had one understanding and Sugarman another on this single detail as to the necessity of consent, modern contract law would not let either the guaranty or the amendment fail for "lack of mutual understanding." Instead the courts would fill the gap with a "reasonable" solution, either attributing it to both sides' intent (conforming to what was taught when judges were in law school) or confessing that this is what

---

[4]Courts have read such a reasonableness obligation into SBA guaranty contracts absent an agreement to the contrary, Small Bus. Admin. v. Sotomayor-Santos, 96 F.3d 584, 585 (1st Cir. 1996) (per curiam); United States v. Mallett, 782 F.2d 302, 304 (1st Cir. 1986), and it would certainly be the minimum that a guarantor would claim if the issue were not addressed. And there is reason to believe that the insertion of the language in question here would have created just such a requirement. See United States v. Baus, 834 F.2d 1114, 1126-27 (1st Cir. 1987).

judges do.  <u>Liberty Mut. Ins. Co.</u> v. <u>Nippon Sanso K.K.</u>, 331 F.3d 153, 159 (1st Cir. 2003); 2 <u>Farnsworth On Contracts</u> § 7.9, at 285.

The district judge took a third course by attributing the outcome to the burden of proof, but the result would hardly be different if the judge were asked (in a pointless remand) to choose the reasonable solution.  Sugarman's aim had been to get the collateral positioned ahead of his own liability; the amendment accepted by the SBA clearly did this and, just as clearly, implicitly negated the boilerplate to the contrary.  Sugarman might reasonably think it equally implicit that the collateral could not be disposed of without his consent.

Although Sugarman's lawyer drafted the added sentences, it was the SBA that insisted on retaining all of the boilerplate including language flatly contrary to the addendum.  Each can be regarded as the drafter of part of the contract, so the maxim of <u>contra proferentem</u> uselessly runs against both, 2 <u>Farnsworth on Contracts</u> § 7.11 at 300-04; but the SBA is the main cause of the muddle by accepting the modification and then (according to Baseman) refusing to accept any adjustment in the boilerplate.

Finally, we have Proulx's letter acknowledging a "moral" obligation not to release the collateral and admitting that Sugarman was safe if the release did not occur; the fact that the SBA did secure Sugarman's consent in the earlier limited release of collateral; and the failure of LPP to secure any SBA witness

-15-

offering a different understanding of events.  However limited the weight of such considerations, they are certainly not helpful to LPP's position.

In the end, the district court's decision as to the need for consent is reasonable and a remand to recast slightly the rationale would serve no purpose.  This brings us to LPP's very brief final argument, which is that Sugarman failed to show damages from the release of the collateral without his consent.  It might be a nice question, not briefed by either side, whether an implicit requirement of consent was a condition of Sugarman's liability or merely an independent breach for which he had to show damages.

The failure to brief the issue could be fatal to LPP but there is a good reason why it has not devoted much attention to the damages issue.  Proulx's letter said that Sugarman was safe just before the collateral was released; it is fair enough to treat this as proof that, but for the release, he would owe nothing.  This, seemingly, is what the district court did, and to this view LPP offers no rebuttal.

Affirmed.

ADDENDUM

Initial exchange regarding burden of proof:

THE COURT: . . . . [W]ho has the burden of proving what?

. . .

MR. MURPHY [counsel to Sugarman]: I think the plaintiff has to prove the intent -- not only the intent of the parties, but that the parties lived up to their obligations under the agreement....

. . .

MR. LITTERIO [counsel to LPP]:  I think we bear the burden on the intent of the parties, but I disagree with the affirmative defense, which is did we breach the contract which would relieve me of my obligations.


Second exchange regarding burden of proof:

THE COURT: . . . Did we agree that the plaintiff has the burden of proving that they didn't violate the guaranty or that the guaranty --

MR. MURPHY: Yes.

MR. LITERRIO:  I'm sorry.  I'm sorry.  I'm not sure what we agreed to, because I think the defendant -- the plaintiff has the burden of establishing that there was a contract, that there has been a breach of that contract and what the damages are.  That's my understanding of our burden of proof.

If there's a defense that there was a breach of a term which relieved the defendant of an obligation --

THE COURT:  That's the defendant's burden.

MR. LITTERIO: -- that's the defendant's burden.

THE COURT:  Okay . . . .