Charles **LANGONE**, Fund Manager of the New England Teamsters and Trucking Industry Pension Fund, Plaintiff

v.

**SOUTHEASTERN METAL FABRICATORS, INC.,** Defendants.

Civil Action No. 08–10337–RCL.

United States District Court, D. Massachusetts.

July 28, 2009.

Catherine M. Campbell, Feinberg, Campbell & Zack, P.C., Boston, MA, for Plaintiff.

James F. Grosso, O'Reilly, Grosso & Gross PC, Framingham, MA, for Defendants.

## MEMORANDUM OF DECISION

YOUNG, District Judge.

## I. INTRODUCTION

Plaintiff Charles Langone ("Langone"), Fund Manager of the New England Teamsters and Trucking Industry Pension Fund ("Fund"), filed suit against Southeastern Metal Fabricators, Inc. ("Southeastern"), under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1145, to recover an alleged $7,218.05 deficiency in Southeastern's contributions to the Fund for the calendar years of 2002 to 2005. The Fund claims that a 2006 audit revealed that Southeastern failed to make contributions required by the Rules and

Regulations of the New England Teamsters and Trucking Industry Pension Plan ("Collective Bargaining Agreement")[1] that Southeastern entered into with the General Teamsters, Chauffeurs, Warehouseman & Helpers of Brockton & Vicinity, Local Union No. 653 ("the Teamsters").

The Fund now moves for summary judgment. For the reasons discussed below, the Court DENIES the Fund's motion.

### A. Factual Background and Procedural Posture

Article 17 of the Collective Bargaining Agreement specifies the manner in which Southeastern is obligated to contribute to the Fund. Although the amount of the hourly contribution (signified by "X" below) changed over time, the language and formula prescribing the parameters of contributions remained consistent throughout the relevant time period. Article 17(b) provides:

> [F]or each hour or portion thereof, figured to the nearest quarter hour for which an employee receives pay or for which pay is due, [Southeastern] shall make a contribution of [$X] to the ... Fund but not more than [$40X] per week for any one employee from the first hour of employment of such week.
>
> . . . .
>
> For purposes of this section, each hour for which wages are paid or due, or any portion thereof figured to the nearest quarter hour, as well as hours of paid vacation, paid holidays and other hours for which pay is due or received by the

employee, shall be counted as hours for which contributions are payable. In computing the maximum amount due any week, there shall be no daily limit on the number of hours for any one day in such week, whether such hours are performed on straight time or overtime rates, but payments shall be made at the amount set forth above.

(Collective Bargaining Agreement, Art. 17(b), Ex. A, attach. to Aff. of Charles Langone ("Langone Aff."), Doc. No. 15.)

### B. The 2006 Audit

On July 27, 2006, Coleen Barret–Holland ("Barret–Holland"), the Fund's auditor, conducted an audit of Southeastern's contributions to the Fund for the calendars years 2002 to 2005. (Fund's Statement of Undisputed Material Facts ("PSOF") ¶ 12, Doc. No. 13.) Barret–Holland determined that Southeastern Metal failed to contribute $7,218.05 during that period for "hours paid at termination, paid vacation hours, paid holidays, clerical mistakes, and interest. . . ." (*Id.* ¶ 13.)

Three payroll concepts are critical to understanding how Barret–Holland arrived at her calculation. The first is what the Court will call "work-hours," which are the number of hours an employee actually worked and for which he or she was paid. The second is "non-work-hours," which is the number of hours for which an employee was paid but *did not* work, including paid vacation, paid holidays, vacation pay taken in lieu of time off[2], and hours paid at termination[3]. The final concept is "con-

---

1. The Collective Bargaining Agreement actually consists of two separate agreements, the Collective Bargaining Agreement covering November 1, 2003 to October 31, 2009, and the Collective Bargaining Agreement covering November 1, 1998 to October 31, 2003. Because the terms of the documents are materially identical, for ease of reference, the Court will refer collectively to the two agreements as the Collective Bargaining Agreement.

2. Vacation pay taken in lieu of time off refers to when an employee actually comes in to work and elects to cash in an unused vacation day, resulting in twice the amount of pay for that day

3. When an employee is fired or quits, the Collective Bargaining Agreement requires that he or she be paid for all of his or her unused sick time and vacation days.

tribution-hours," that is the number of hours for which Southeastern was obligated to contribute to the Fund.

In conducting the audit, Barret–Holland engaged in a number of accounting practices that the parties agree were clearly in accordance with the Collective Bargaining Agreement. First, she never permitted the number of contribution-hours for a given week to exceed 40. (*Id.* ¶ 15.) As a result, the most Southeastern could be obligated to contribute to the Fund was 2,080 contribution-hours per employee per year (52 weeks multiplied by 40 hours).[4] (*Id.*) Second, where an employee had actually worked more than 40 hours in a week, and thus had more than 40 work-hours, Barret–Holland concluded that the employee forfeited the fringe benefit of Fund contributions for the excess hours. (*See* Fund's Reply at 2, Doc. No. 19.) In other words, if an employee worked 50 hours in a week (50 work-hours), Southeastern was not obligated to contribute to the Fund for the 10 hours in excess of its 40 contribution-hour limit. Third, where the sum of work-hours and non-work-hours in a given week was less than or equal to 40, Barret–Holland concluded that Southeastern was obligated to contribute to the Fund for all of those hours. (*Id.*) For example, if an employee worked 16 hours and took 24 hours of paid vacation, the Fund had an obligation for 40 contribution-hours.

The parties disagree, however, over how Barret–Holland accounted for non-work-hours in weeks where the sum of work-hours and non-work-hours exceeded 40. This dispute is most easily understood through the use of an example. Imagine that an employee had 2,000 work-hours and 80 non-work-hours in a given year. Imagine also that the employee, for whatever reason, received payment for all 80 non-work-hours during weeks in which the employee also had 40 work-hours.[5] In conducting her audit, Barret–Holland calculated that Southeastern owed contributions for all 2,080 hours, even though the employee, by necessity, was paid in excess of 40 hours in at least one pay period. (*Id.*) To reach this conclusion, Barret–Holland and the Fund interpreted the Collective Bargaining Agreement as mandating that Southeastern contribute to the Fund for *all* non-work-hours, even if they were accrued in weeks where the sum of work-hours and non-work-hours exceeded 40, as long as the Southeastern's annual contribution-hours were capped at 2,080. (*Id.*) Barret–Holland essentially reallocated the non-work-hours in excess of 40 in a week to other weeks in which the sum of work-hours and non-work-hours was less than 40. The only justification provided by the Fund for this interpretation of the Collective Bargaining Agreement is that it has been "the consistent policy of the ... Fund to require contributions for paid vacation, paid holidays and other hours for which pay is due or received by the employee up to a 2,080–hour–per–year limit based on a 40–hour–per–week limit." (PSOF ¶ 11.)

## C. The Instant Lawsuit

Langone filed suit against Southeastern on behalf of the Fund on February 28, 2008. (Complaint, Doc. No. 1.) The Fund moved for summary judgment on October 1, 2008. (Doc. No. 13.) The parties

---

4. In 2005, which was a leap year, there were 53 pay periods instead of 52. As a result, the cap on contribution-hours for that year was 2,120, instead of 2,080. This distinction makes no difference to the Court's analysis.

5. This could occur if the employee took two weeks of unpaid vacation and elected to take two weeks of pay in lieu of vacation time. It could also occur if an employee was terminated, and paid for 40 or more non-work hours, during a week in which that employee also received pay for work-hours.

agreed that the Court would decide the motion on the papers.

## II. ANALYSIS

### A. Federal Standard

Summary judgment is appropriate when the facts properly supported by the record and taken in the light most favorable to the non-moving party "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The moving party "bears the initial burden of demonstrating that there are no genuine issues of material fact for trial." *Hinchey v. NYNEX Corp.,* 144 F.3d 134, 140 (1st Cir.1998). That burden " 'may be discharged by showing— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case.' " *Id.* (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "[T]he nonmovant may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists.... Doing so, however, requires more than the frenzied brandishing of a cardboard sword.... [A] conglomeration of conclusory allegations, improbable inferences, and unsupported speculation is insufficient to discharge the nonmovant's burden." *Calvi v. Knox County,* 470 F.3d 422, 426 (1st Cir.2006) (citations and quotations marks omitted).

### B. The Arbitrary and Capricious Standard

██ "An ERISA fund's decision that contributions are due [is] 'reviewed under a deferential arbitrary and capricious standard where ... the language of the underlying plan reserves discretion to the' trustee to interpret the language of the plan and resolve disputes." *Langone v. USCO Distribution Services, Inc.,* 389 F.Supp.2d 91, 97 (D.Mass.2005) (Saris, J.) (ellipses in original) (quoting *Pari–Fasano v. ITT Hartford Life & Accident,* 230 F.3d 415, 418 (1st Cir.2000)); *see also Diaz v. Seafarers Int'l Union,* 13 F.3d 454, 456 (1st Cir.1994) (holding that where plan grants trustee discretion, "[a] court will give trustees considerable leeway to interpret and to apply pension plan rules, setting aside those trustee decisions only if they are arbitrary, capricious, or an abuse of discretion."). Here, the parties agree that various provisions of the Trust Agreement (under which Southeastern agreed to join the Collective Bargaining Agreement), grant the Fund the discretion to construe the terms of the Collective Bargaining Agreement. (*See* Trust Agreement, Arts. IV, X, Ex. B attach. to Langone Aff.) Thus, the arbitrary and capricious standard applies.

██ Under the arbitrary and capricious standard, this Court must uphold the Fund's decision if it was "reasoned and supported by substantial evidence." *Stamp v. Metro. Life Ins. Co.,* 531 F.3d 84, 87 (1st Cir.2008) (citation and quotation marks omitted). "Where the trustees of a plan impose a standard not required by the plan's provisions, or interpret the plan in a manner inconsistent with its plain words, or by their interpretation render some provisions of the plan superfluous, their actions may well be found to be arbitrary and capricious." *Miles v. New York State Teamsters Conference Pension & Ret. Fund Employee Pension Benefit Plan,* 698 F.2d 593, 599 (2d Cir.1983). Accordingly, in order to prevail, the Fund, as the moving party, must demonstrate, as matter of law, that the Fund's interpretation of the Collective Bargaining Agreement was reasonable, i.e. not arbitrary and capricious.

## C. The Merits

The sole disputed issue in this case is whether it was within the Fund's discretion to interpret the pension contribution provision of the Collective Bargaining Agreement as permitting, for purpose of calculating Southeastern's contributions, the distribution of excess non-work-hours to weeks in which the sum of an employee's work-hours and non-work-hours was less than 40.

### 1. The Principle of Contract Interpretation as They Relate to Collective Bargaining Agreements

Section 515 of ERISA provides:

Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. As such, to determine if the Fund's interpretation of the Collective Bargaining Agreement was reasonable, this Court must construe the "terms and conditions" of the Agreement.

■■■ "Although federal law governs the construction of collective bargaining agreements, traditional contract principles apply when not inconsistent with federal labor law." *Einhorn v. Fleming Foods of Penn., Inc.*, 258 F.3d 192, 194 (3d Cir. 2001); *see Smart v. Gillette Co. Long–Term Disability Plan*, 70 F.3d 173, 178 (1st Cir.1995). Under federal law, normal, "common-sense canons of contract interpretation" guide the Court, *Vickers v. Boston Mut. Life Ins. Co.*, 135 F.3d 179, 181 (1st Cir.1998), first among them, that "con-tracts containing unambiguous language must be construed according to their plain and natural meaning." *Smart*, 70 F.3d at 178 (citing *Burnham v. Guardian Life Ins. Co.*, 873 F.2d 486, 489 (1st Cir.1989)); *Senior v. NSTAR Elec. & Gas Corp.*, 449 F.3d 206, 218 (1st Cir.2006) ("An unambiguous contract must be enforced according to its terms, under both the common law and labor law.").

■■■ "Contract language is usually considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and obligations undertaken." *Fashion House, Inc. v. K mart Corp.*, 892 F.2d 1076, 1083 (1st Cir.1989). Whether or not a provision of a contract is ambiguous is matter of law, *LPP Mortgage, Ltd. v. Sugarman*, 565 F.3d 28, 31 (1st Cir.2009), and courts generally[6] ought not consider extrinsic evidence in making that determination. *Smart*, 70 F.3d at 178. If, however, a court holds that part of a contract is ambiguous, the interpretation of the debatable term is a question of fact that should be put before the trier of fact and the trier of fact may consider extrinsic evidence in resolving the dispute. *Id.*

### 2. On the Record Before the Court, the Fund's Interpretation of the Collective Bargaining Agreement Was Not Reasonable.

■■ Given the preceding principles of contract interpretation and the current state of the record, the Court holds that the plain terms of the Collective Bargaining Agreement unambiguously contradict

---

**6.** Courts may, however, consider extrinsic evidence "for the very purpose of deciding whether the documentary expression of a contract is ambiguous, for there is a real possibil-ity that extrinsic evidence may in fact reveal an ambiguity not otherwise patent." *Sugarman*, 565 F.3d at 32 n. 2 (citations and quotation marks omitted).

the Fund's interpretation of the pension contribution provision.

The Fund's interpretation rests on a fundamental distinction the Fund makes between work-hours and non-work-hours. The Fund reads the Collective Bargaining Agreement as creating two separate contribution obligations for the two types of pay. First, the Fund argues that "there is a clear obligation to contribute for hours worked [work-hours] up to 40 hours per week." (Pl.'s Reply Br. at 2) On this point, the Fund and Southeastern are in full agreement. Second, the Fund claims that there is a "separate obligation to pay [all] vacation and holiday hours [non-work-hours]." (*Id.*) It is this conclusion that the parties dispute vigorously. The Fund believes that the Collective Bargaining Agreement can be read to require Southeastern to contribute to the Fund for all non-work-hours, so long as the annual sum of work-hours (capped at 40 per week) and non-work-hours (with no weekly limit) is less than or equal 2,080. It argues that "[w]hen the employer chooses to make contributions for [non-work-hours] *is irrelevant.*" (*Id.* (emphasis added).) Southeastern claims that the 40 contribution-hour per week limit in the Collective Bargaining Agreement should be read to apply equally to work-hours and non-work-hours.

The Court holds, on the record before it, that Southeastern's interpretation of the pension contribution provisions is the only plausible, and thus reasonable, interpretation of the Collective Bargaining Agreement. The language of the pension contribution provision treats work-hours and non-work-hours in exactly the same manner. The second paragraph of Article 17(b) provides that Southeastern must make a contribution of $X to the Fund for "each hour or portion thereof ... *for which an employee receives pay or for which pay is due* ... but not more than [$40X] per week for any one employee from the first hour of employment." (Emphasis added). The remainder of the Article makes clear that non-work-hours, like work-hours, are hours "for which an employee receives pay or for which pay is due." The eighth paragraph of Article 17(b) states:

> For purposes of this section, each hour for which wages are paid or due, ... *as well as hours of paid vacation, paid holidays and other hours for which pay is due or received by the employee,* shall be counted as hours for which contributions are payable.

(Emphasis added). The Court sees no way in which it can interpret this Article as establishing any principle other than that contributions should be made in the exact same manner for work-hours and non-work-hours. And the Fund has introduced no extrinsic evidence that would indicate that Article 17 is more ambiguous than meets the eye. Thus, read as a whole in light of the record before the Court, Article 17(b) provides unambiguously that the 40 hour per week limit applies equally to both work-hours and non-work-hours.

The Fund cites *New York Teamsters Conference Pension & Retirement Fund v. United Parcel Service, Inc. (UPS),* 198 F.Supp.2d 188 (N.D.N.Y.2002) *aff'd* 382 F.3d 272 (2d Cir.2004), in support of its position that it was reasonable for it to distribute excess non-work-hours throughout the year into weeks in which the sum of work-hours and paid hours was less than 40, as long as the total contribution-hours were less than 2,080. To be certain, the facts in *UPS* are strikingly similar to those in the instant case. In *UPS*, as here, the pension fund had discretion to construe terms and provisions of the collective bargaining agreement, and thus the arbitrary and capricious standard applied. *Id.* at 200 (stating that "[t]he issue for the Court

to determine is whether it was *reasonable* for the Funds' auditors to interpret the relevant documents" in the manner that they did). As here, the collective bargaining agreement provided that UPS would contribute to the pension fund for all work-hours and non-work-hours up to 40 per week, for an annual total of 2,080 contribution-hours. *Id.* at 200 n. 17. As here, the pension fund, in conducting its audit, interpreted the collective bargaining agreement so as to permit the fund to distribute nonwork-hours (including unused sick leave, holidays and roving holidays, and vacation time) to weeks in which the sum of work-hours and non-work-hours was less than 40, so long as the annual total of work-hours and non-work-hours was less than 2,080. *Id.* at 201.[7] Given that set of circumstances, the district court in *UPS* held that, "[l]ooking at the record as a whole, the Court concludes that the auditors' conclusion that UPS is required to make contributions for up to 2,080 hours per year for each ... employee, regardless of when UPS actually pays an employee for [non-work-hours], is reasonable." *Id.* at 202; *see also id.* at 201–06.

The Fund, however, fails to appreciate a number of material substantive and procedural differences between *UPS* and the instant case. To begin, the *UPS* court made its ruling after conducting a five-day bench trial, collecting significant documentary evidence, and hearing volumes of testimony regarding the parties' negotiations and course of dealing. The different procedural posture is significant for at least two reasons. First, and most importantly, the *UPS* court was the trier of fact, and thus was required to resolve disputed issues of material fact. This Court must, in contrast, resolve all disputed issues of material fact in favor of Southeastern. Second, the *UPS* court had the benefit of a fully developed record. Here, the Court has an extremely limited record that consists primarily of the Collective Bargaining Agreement itself.

Substantively, the collective bargaining agreements in *UPS* and the instant case (to the extent the Court can discern the exact contents of the UPS agreement)[8] differ in crucial and material ways. The UPS agreement stated explicitly that "[p]ayments to the Fund *must* be paid by the employer for the employees' paid vacation and holiday periods." *Id.* at 202, 204–05 (emphasis added). The court held, albeit implicitly, that this provision conflicted with the general provision mandating contributions of $X per hour up to $40X per week, creating ambiguity in the agreement.[9] This sets *UPS* apart from the instant case, because as the Court discusses above, Article 17 is not ambiguous on its face, nor is it in conflict with other provisions of the Collective Bargaining Agreement.

Because the *UPS* court deemed the agreement ambiguous, it took into account considerable extrinsic evidence of the parties' negotiations and course of dealing. That extrinsic evidence—including testi-

---

7. *See id.* at 201 ("In conducting the audit, after assessing all other contributions, the auditors determined whether UPS had made contributions for 2,080 hours per year for each employee. If the 2,080–hour maximum had not been met, the auditors allocated the [non-work-hours] to a week in which the employee received less than forty hours of pay.").

8. The *UPS* court quotes rather sparingly from the UPS agreement, making it difficult to compare it, in its entirety, to the agreement at issue in this case.

9. Although the *UPS* court did not explicitly state that it identified an ambiguity in the pension contribution provision, the fact that the court considered so much extrinsic evidence indicates that it viewed the agreement as ambiguous.

mony from the Fund's management and auditor and from UPS executives, memoranda written by the Fund and UPS, and minutes from meetings at which the agreement was discussed—validated, at least in part, the Fund's interpretation of the pension contribution provisions. In contrast, in the case at bar, the extrinsic evidence submitted by the parties (competing affidavit's from Langone (on behalf of the Fund) and Russell J. Anderson (President of Southeastern)), sheds little, if any light on the parties' negotiations, course of dealing, or subjective understandings of their Collective Bargaining Agreement.[10]

Finally, one of the primary drivers of the *UPS* court's decision in favor of the pension fund was evidence, introduced at the trial, that UPS was purposefully manipulating the date on which it compensated its employees for non-work-hours in order to avoid additional pension obligations. Payroll records indicated that UPS forced its employees to cash in their unused annual sick leave on a single date, frequently resulting in more than 40 hours of compensation in a single week. *UPS*, 198 F.Supp.2d at 201 n. 19. UPS would also allocate paid vacation time to the week before or after an employee actually took his or her vacation, as opposed to the payroll period in which the employee was on vacation and received no pay. *Id.* at 202–03.

The Fund suggests that Southeastern could engage in the same practice. (Pl.s' Reply Br., at 2 (suggesting that if the Court rejects its position, it would lead to the "absurd result that an employer could cut an employee's vacation check during a week when the employee was working,

claim the 40 hour weekly limit had been exceeded, and avoid paying contributions for any vacation whatsoever.").) The record, however, is devoid of any evidence that Southeastern has ever acted toward the Fund with such bad faith.

In summary, the *UPS* court held that the pension fund's interpretation of the collective bargaining agreement was reasonable because: (1) it was able to make findings of fact, (2) it identified ambiguities in the agreement, (3) the parties' negotiations and course of dealing suggested that the parties intended to regulate pension contributions in the manner adopted by the pension fund, and (4) there was evidence of bad faith by UPS. None of those conditions exist in the instant case. As a result, the holding in *UPS*, which is not binding on this Court, does not persuade this Court that the Fund's interpretation is reasonable.

Thus, the Court holds, on the current record, that the Fund's interpretation of the Collective Bargaining Agreement's pension contribution provision was not, as matter of law, reasonable, i.e. arbitrary and capricious. The Court wishes to be clear, however, that it does not hold, as matter of law, that the Fund's interpretation was arbitrary and capricious. Because Southeastern did not submit a cross motion for summary judgment, the Court was not asked to determine, as matter of law, whether the Fund's interpretation was arbitrary and capricious. It has instead drawn all inferences in favor of Southeastern. The Court denies the Fund's motion only because, on the current state of the record, it cannot, as matter of law, hold that the Fund's interpretation of the Col-

---

**10.** Langone claims that "[i]t has been the consistent policy of the Pension Fund to require contributions for paid vacation, paid holidays and other hours for which pay is due or received by the employee up to a 2,080–hour–per–year limit based on a 40 hour per week limit." (Aff. Of Charles Langone, Doc. No. 15.). Anderson asserts, unsurprisingly, that no such policy exists. (*See* Aff. Of Russell J. Anderson ¶ 10, attach. to Southeastern's Mem. Opp. Mot. Summ. J.)

lective Bargaining Agreement was reasonable.

## III.  CONCLUSION

For the reasons discussed above, the Court DENIES the Fund's motion for summary judgment.  (Doc. No. 13.)

SO ORDERED.