# United States Court of Appeals
## For the First Circuit

No. 10-2086

HOUSE OF FLAVORS, INC.,

Plaintiff, Appellee,

v.

TFG MICHIGAN, L.P.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Lynch, Chief Judge,

Torruella and Boudin, Circuit Judges.

Richard F. Ensor with whom Vantus Law Group, P.C., Alexia Pappas and Verrill Dana, LLP were on brief for appellant.
Lee H. Bals with whom Marcus, Clegg & Mistretta, P.A. was on brief for appellee.

June 23, 2011

**BOUDIN**, <u>**Circuit Judge**</u>.  Tetra Financial Group, L.P. ("Tetra") appeals from a judgment granting House of Flavors, Inc. ("House of Flavors") rescission, together with an adjustment payment, of a lease agreement between the parties.  Reserving further detail for discussion of the merits, the factual background and proceedings below can be briefly summarized.

House of Flavors is a company, based in Michigan but with its executive office in Maine, that makes ice cream; its president during the relevant period has been Whit Gallagher.  Tetra is a Utah-based limited partnership that specializes in business equipment leasing.  In 2005, House of Flavors decided to acquire and install an ice cream hardening system ("the system").  By coincidence, about this time Gregory Emery, Tetra's national account executive, inquired whether House of Flavors had any projects for which it needed financing.

Tetra drafted a letter of intent, which contemplated that Tetra would finance the acquisition of the system and its very expensive installation costs including further materials costs, that Tetra would hold title to the assembled machine and reap the tax benefits of ownership, and that House of Flavors would have an option at the end of a base period to buy the system or to extend or terminate the lease.  During the negotiations with Emery and with Ryan Secrist, Tetra's executive vice president and sales

manager, Gallagher insisted that he needed a guaranteed maximum price for the end-of-lease purchase.

Tetra refused to put a fixed price--or at least anything below 20 percent of the total cost of the system as installed--into the lease, saying that to do so could compromise its ability to reap the full tax benefits of ownership. On November 10, 2005, House of Flavors purchased a suitable machine in a Maryland auction for around $105,000 (although the full cost of the system as finally assembled and installed was expected to be much higher), and Gallagher informed Emery of the purchase on November 15, 2005.[1]

In a conference call with Gallagher on November 18, 2005, Secrist and Emery offered to provide Gallagher with a side letter that would reflect a buyout value of 12 percent of the cost of the system and its installation. Secrist sent a side letter to Gallagher on November 22, 2005, which stated in pertinent part:

> Pursuant to our conversation, we have reviewed
> the list of property expected to be purchased
> and have estimated an end of term value of ten
> percent (10%) of its original cost. Please
> note that this end of term value estimation is
> not intended to represent a commitment by you,
> or an obligation by us, to buy or sell the
> equipment, as the case may be for that, or any

---

[1]The initial letter of intent between the parties contemplated a loan of around $1.5 million for the system; this turned out to be very close to the total cost of the system as installed; and, without very careful wording, the percentage figures exchanged by the parties treated the total cost as the figure to which the relevant percentage would be applied in fixing a sale price--if one were fixed.

other price at the conclusion of the Base (or extended, if applicable) Lease Term.

Shortly after receiving the side letter, Gallagher signed the letter of intent and sent it to Tetra.

In later conversations, Secrist told Gallagher that he could not get a deal approved at Tetra with a ten percent buyout cap, but assured Gallagher that he could get the deal approved at 12 percent. On January 5, 2006, Gallagher told Secrist that he accepted Tetra's revised terms and requested that Tetra begin preparing lease documents. That same day, Tetra sent Gallagher a revised side letter, substantively identical to the first except that it estimated an end-of-term buyout price of 12 percent.

In March 2006, Tetra and House of Flavors executed a Master Lease Agreement, dated January 13, 2006, which provided in pertinent part that ownership of the system as installed would transfer to Tetra, and that at the end of the thirty-six month lease term, House of Flavors

> shall . . . elect one of the following options: (i) purchase [the system and associated equipment] for a price to be agreed upon by both [Tetra] and [House of Flavors], (ii) extend the Lease for twelve (12) additional months . . . or (iii) return the [system] to [Tetra] at [House of Flavors'] expense . . . .

No reference to a fixed price or the 12 percent figure appears in the final agreement, but the agreement did provide for payments by

House of Flavors during the construction period as Tetra was providing loan funds.

From March to August 2006, Tetra funded the installation of the system in the House of Flavors plant, at a final cost of $1,435,130.36. On August 30, 2006, House of Flavors executed a bill of sale of the system, transferring ownership to Tetra. That same day, the parties executed a lease schedule that incorporated the conditions of the Master Lease Agreement and provided that House of Flavors would make monthly payments during the lease period.

Two years later, in August 2008, Gallagher approached Tetra about buying out the system early, and on August 28, 2008, Tetra informed House of Flavors that the price for acquiring the system would be $571,468.90--around 40 percent of the original cost of the equipment and installation. Confronted with the side letter, Tetra eventually lowered the price to 35 percent and later to 30 percent; but Gallagher would not agree to more than 12 percent and in February 2009 House of Flavors brought suit in federal district court.

The complaint asserted claims for breach of contract and the covenant of good faith and fair dealing, violation of the Utah Unfair Practices Act, promissory estoppel and fraud. In December 2009, Tetra secured partial summary judgment dismissing all claims save for the last two. While the district judge flatly rejected

the claim that there was a contractual agreement for the 12 percent figure, he pointed to the "estimate" in the final side letter as raising a fraud question, noting that fraud might void the lease.[2]

The district court held a three-day bench trial on April 13-15, 2010, and, on June 17, 2010, filed a decision finding against House of Flavors on the promissory estoppel claim but for it on the fraud claim. On the former, the court rejected the claim that Tetra had promised to sell the system back at the 12 percent figure; on the latter, the court held that Tetra had fraudulently professed to have estimated 12 percent as the price when in fact it had made no estimate whatever.

As an equitable remedy "analogous to rescission," the district court sought to unwind the transaction by requiring Tetra to transfer title of the system back to House of Flavors. The court asked each side to make a further filing to help the court shape the rescission remedy, although (given their responses) the parties may not have fully understood just what was expected of

---

[2]When in March 2010 House of Flavors' final pretrial memorandum expressly requested rescission as a remedy, Tetra objected, partly on grounds that the request was untimely, but the district judge refused the request.

them.[3]  What both sides did understand was that the remedy would entail the transfer of the system back to House of Flavors.

In all events, House of Flavors projected a handsome recovery for itself over and above recapturing title to the system. Tetra, by contrast, argued that a full restoration of benefits was an incalculable objective; but it supplied some figures useful to the district court.  In the end, the court devised its own remedy drawing on the filings and scattered figures appeared in a record that had been compiled primarily to decide the merits rather than the remedy.

Ultimately, the court ordered Tetra to convey the system to House of Flavors and pay it $27,097.  To arrive at this figure, the court calculated what it thought was the balance due between the parties, assuming that the system passed back to House of Flavors based on the 12 percent purchase price and taking account of what Tetra had been promised, what it had received, and what was needed to compensate House of Flavors for an extra cost it incurred

[3]The district court's request read in relevant part:

If House of Flavors receives the difference between what it has paid Tetra in lease payments and what Tetra paid for the equipment as installed, will House of Flavors have had, in effect, an interest-free loan of some amount for some period of time?  If I do not have evidence in the record from which to make a determination of this benefit to House of Flavors, what is the consequence? Can I reopen the record . . . ?  If not, who has the burden of proof on this issue and what are the consequences if it has failed to meet that burden?

due to Tetra's delaying the exercise of the purchase option. The court's theory and calculation are described in more detail below.

Tetra then filed a motion to reconsider, pointing out that the court's calculations omitted certain payments that House of Flavors had owed under the agreement. If taken into account, Tetra said that these amounts meant that it was still due about $150,000 even if all of the other calculations were accepted. House of Flavors said it was too late for Tetra to offer new evidence, and the district court agreed, denying the motion. This appeal followed.

The rescission remedy. In this court, Tetra first argues that House of Flavors switched theories in mid-course. It notes that House of Flavors' complaint, and initial efforts to litigate the case, urged that Tetra was bound (under contract, promissory estoppel, and related doctrines) to sell the assets for 12 percent. Such a legal commitment was rejected by the district court in its grant of partial summary judgment for Tetra.

Therefore, Tetra asserts, the complaint did not fairly give warning that rescission would be sought and that House of Flavors formally proposed this remedy only six weeks before trial. But the complaint had also charged fraud; rescission is an available remedy, see Mecham v. Benson, 590 P.2d 304, 307-08 (Utah 1979); and the court can award any relief to which the party is entitled, Fed. R. Civ. P. 54(c); United States v. Marin, 651 F.2d

-8-

24, 31 (1st Cir. 1981); see also Bontkowski v. Smith, 305 F.3d 757, 762 (7th Cir. 2002) (Posner, J.).

Of course, when a case evolves in a new direction not fairly foreseeable, a surprised party may be entitled to additional time to prepare. Tetra could have pressed for a delay on this ground, and the judge--who had more or less suggested that remedy-- would have been hard put to deny a reasonable request. But Tetra, who knew that the case had changed direction in December 2009, made no such request and cannot now claim unfair surprise.

Tetra's next objection is that for rescission, the Utah state law requires that the party seeking it act promptly once the basis is known.[4] The requirement rests on the ground that one who, knowing of a ground for rescission, continues without protest to enjoy the benefits of a contract "affirms" it and can thereafter enforce but not disavow it. E.g., Frailey v. McGarry, 211 P.2d 840, 844-45 (Utah 1949); Cont'l Ins. Co. v. Kingston, 114 P.3d 1158, 1161-63 (Utah Ct. App. 2005).

House of Flavors answers that it was prepared to affirm the contract as it understood it, turning to rescission promptly once its reading was rejected by the court; but its reading was pretty clearly wrong from the outset. However, the relief here is

---

[4]The assumption, shared by the parties, that Utah law governed the fraud claim may or may not be correct; this is a fraud claim, involving multiple states, and both the applicability and meaning of the contract's choice of Utah law language might be questioned.

as much an _affirmance_ of the contract as a rescission: both theories support _recapture_ of the system by House of Flavors; what remains is a financial adjustment which--if anything more were due to a plaintiff--could be justified as a fraud remedy independent of rescission.

Tetra finally argues that House of Flavors supposedly engaged in a continued "acceptance of contract benefits" and failed to "undertake any effort to return the parties to the pre-lease status quo." _See, e.g._, _Knudsen Music Co._ v. _Masterson_, 240 P.2d 973, 975 (Utah 1952). Again, the _pre-lease_ status quo was ownership of the system by House of Flavors and to this extent the outcome was both a return to the status quo ante _and_ _also_ to the expected outcome of the contract.

Not only was a buy back by House of Flavors one of the options provided in the contract but it was the rational and (according to Tetra's own witnesses) the expected outcome. To dismantle the installed system would sacrifice for both sides the value of the soft costs of installation. Tetra received continuing benefits back all along through the scheduled payments; whether it was over- or underpaid is a question to which we will return.

_The merits_. Whether Tetra committed fraud is the next issue raised on appeal but this is primarily a factual issue. _See_ _Integrated Genomics, Inc._ v. _Gerngross_, 636 F.3d 853, 863 (7th Cir. 2011). The district judge heard the witnesses and his factual

-10-

findings are reviewed only for clear error; to the extent legal objections are made, they are reviewed de novo. LPP Mortg., Ltd. v. Sugarman, 565 F.3d 28, 31 (1st Cir. 2009).

Here, the fraud claim was that Tetra, when asked for a fixed buyout price, said that for tax reasons it could not promise this in the agreement but had itself estimated the buyout price at 12 percent of original cost. Tetra now admits that it never made any such estimate. When it finally set a buy back figure, it was almost 40 percent, only grudgingly reduced thereafter and never to 12 percent. So its claim to have made an estimate was false.

The further requisites of a fraud claim are a deceitful state of mind on one side and reasonable reliance on the other.[5] The district judge, after listening to testimony and reviewing the documents, found that Tetra had behaved dishonestly. The district judge's assessment is aided by the defendant's admission, the side letters underscoring the low figure anticipated, and the remarkable (and still unexplained) spread between the 12 percent estimate and the 40 percent initially demanded.

As for reasonable reliance, this is Tetra's main target in its merits discussion. Tetra stresses that Utah law requires

---

[5]These, along with resulting harm, are the requisites for common law fraud. Restatement (Second) of Torts § 525 (1977). See Gold Standard, Inc. v. Getty Oil Co., 915 P.2d 1060, 1066-67 (Utah 1996). Accord Francis v. Stinson, 760 A.2d 209, 217 (Me. 2000); Hord v. Envtl. Research Inst. of Mich., 617 N.W.2d 543, 551 (Mich. 2000).

proof of fraud by clear and convincing evidence--a common enough requirement even if Utah law does not govern the fraud claim. E.g., Flynn v. Korneffel, 547 N.W.2d 249, 254 (Mich. 1996). But the trial judge was the fact finder and his determination of reasonable reliance is far from clear error even under the clear and convincing standard.

A buyout figure in the 12 percent range was of central importance to House of Flavors. And Tetra's business was financing and it supplied the 12 percent figure, also explaining why tax reasons prevented it from being set forth as a formal promise. House of Flavors could not rely on a promise it did not get; it could rely on an honest estimate having been made as represented to it and then choose to judge that the final outcome would not differ greatly.

Tetra points us to case law that in a variety of contexts takes a dim view of plaintiffs who claim to rely on alleged oral promises that are contradicted by written language in the instrument or contract. See Gold Standard, 915 P.2d at 1068. As it happens, House of Flavors relied on "estimate" language that was contained in a written document--the side letter. But anyway, in Utah, as elsewhere, fraud and reasonable reliance turn on the facts of the case, Berkeley Bank for Coops. v. Meibos, 607 P.2d 798, 801 (Utah 1980); cf. Youngblood v. Auto-Owners Ins. Co., 158 P.3d 1088, 1096 (Utah 2007), and oral fraud can undermine a written contract.

In Gold Standard, heavily relied on by Tetra, the court refused to find reasonable reliance in a fraud case when writings designed to correct an oral promise were received before any reliance on the oral statements, which were themselves inconsistent with prior written obligations. Gold Standard, 915 P.2d at 1067-68. In our own case, Tetra specifically created the impression that a good faith estimate had been made and never corrected that representation before House of Flavors acted on it.

Tetra correctly says that even the side letter says that the 12 percent estimate does not represent "a commitment by [House of Flavors], or an obligation by [Tetra]." True, a good faith estimate would not be a commitment, nor the basis for suit if it merely turned out to be wrong. But the good faith estimate reduces the risk of one who relies upon it and House of Flavors was exposed by the fraud to a greater risk than it had reasonably assumed.

Tetra repeats that House of Flavors' initial complaint emphasized a supposed promise of 12 percent rather than the (non-existent) estimate of 12 percent. However, the pleadings may be constructively amended to conform to the evidence, Fed. R. Civ. P. 15(b); Rodriquez v. Doral Mortg. Corp., 57 F.3d 1168, 1172 (1st Cir. 1995), and Tetra had fair warning from December 2009 onward of the new direction the case was likely to take.

The payment calculation. The most confusing issue on appeal concerns Tetra's final claim that even if it is liable, the

-13-

district court erred in ordering it to pay House of Flavors $27,097 and that House of Flavors in fact owes Tetra over $150,000. The history and handling of this dispute has been outlined earlier in this decision, but at this point more the district court's calculation needs to be considered in more detail.

In a nutshell, the court made calculations, based on testimony and documents, as to what Tetra was owed under the payment schedule in the agreement and then added to that an imputed final buy back price at 12 percent; the court then compared that to what House of Flavors had already paid (adding to that a House of Flavors payment to a bank[6]); and the court then concluded that the latter sum exceeded the former, leaving Tetra owing $27,097 to House of Flavors.

The district court described this as a rescission remedy, but the bank payment is closer to damages than rescission. Further, property fraudulently taken can be recovered on a fraud theory without invoking rescission, 2 D. Dobbs, Law of Remedies § 9.3(4), at 593-94 (2d ed. 1993), and that might also be true of the 12 percent figure used by the court in its netting out

---

[6]A payment of $13,000 was made by House of Flavors to a bank in order to keep alive an obligatory letter of credit to protect Tetra; but the payment itself was needed only because Tetra had refused to sell back the system at 12 percent at the end of the original term, requiring an extension of the letter of credit. Tetra does not quarrel with this adjustment.

calculation, there being some evidence that due to the fraud House of Flavors had passed up a competing offer of financing.

Remedy theories are more malleable than one might think. Notions of remedies in simple cases--rescission of a sale of a lame horse or damages from a fender-bender--may have to be adjusted in more complicated cases.  Here, the system belongs in House of Flavors' hands; the question is the fair adjustment of other payments as between the parties; and whatever the label, House of Flavors was due ownership of the system; but it still had to pay back the loan including the residual due for re-transfer.

In its reconsideration motion, Tetra identified payments that House of Flavors owed under the agreement but which Tetra said the district court had not included--specifically, initial payments required to Tetra before construction and while it was underway. In response, House of Flavors did not deny Tetra's claims but argued that the figures came too late, and the district court concurred.

We cannot agree.  The trial focused primarily on liability, not the details of the remedy; neither party completely understood, or fully responded to, the district court's request for help in formulating the remedy by itself after the trial. See note 3, above.  Nor are the obligations to which Tetra now points "new evidence" (the lease agreement was in the record).  Finally, House

-15-

of Flavors has thus far declined to defend the omission on the merits.

Thus, although there may be little left to be decided, it is safest to order a remand so that the district court can take due account of the additional payments due to Tetra.  If House of Flavors quarrels with the precise figures, that can be sorted out there.  The district judge did a fine job in devising a fair resolution to this dispute, and the limited correction specified above will complete that objective.

The judgment is <u>affirmed</u> insofar as it awards House of Flavors the system but is <u>set aside</u> insofar as it awards House of Flavors a money payment; and the case is <u>remanded</u> for further proceedings consistent with this opinion.  Each side shall bear its own costs on this appeal.

<u>It is so ordered</u>.