Joan MONAHAN, in her capacity as
Administratrix of the Estate of
Patrick Monahan

v.

Robert R. GIROUARD et al.

No. 2004–12–Appeal.

Supreme Court of Rhode Island.

Oct. 20, 2006.

Richard Riendeau, Esq., Providence, for Plaintiff.

Jeffery Kasle, Esq., For Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

The plaintiff, Joan Monahan [1] (Ms. Monahan), appeals from a grant of summary judgment in favor of the defendants, Pawtucket Housing Authority and certain of its individual officers (PHA or defendants), and from the denial of Monahan's motion for summary judgment. Monahan contended that he was wrongfully terminated by the PHA in July of 2000. He further argued that, as a public employee, he was entitled to a hearing regarding the propriety of his termination. The denial of such

---

**1.** Patrick Monahan, who was the original plaintiff in this suit, passed away on April 18, 2005. On October 26, 2005, Ms. Monahan was appointed the administratrix of Patrick's estate, and on January 6, 2006, we granted her motion to be substituted as plaintiff in this case. In this opinion, when referring to Patrick Monahan, we shall refer to him as Monahan.

a hearing, he alleged, violated his right to due process under the Fourteenth Amendment to the United States Constitution. In his complaint, Monahan sought relief in the form of damages and back pay.[2]

The defendant, in turn, argues that Monahan's termination was wholly justified and that Monahan voluntarily waived all rights to a hearing in a written "last chance agreement" that the parties signed in February 2000. We affirm the judgment of the Superior Court.

## Facts and Procedural History

Patrick Monahan was hired by PHA in 1987 and worked there until he was terminated in June 2000. During the entire tenure of his employment, Monahan's performance was checkered at best, and his employment history was littered with disciplinary actions for a variety of transgressions, including, according to his employer's affidavit, an "extensive history of work related disciplinary infractions and misconduct, [including] insubordination, insolence, excessive absences, excessive tardiness, abuse of sick leave, failure to comply with [PHA] reporting requirements, and smoking on PHA grounds." In addition to the formal disciplinary action it took against him, PHA warned Monahan repeatedly that such recusancy would not be tolerated. For example, in a letter dated March 25, 1999, PHA warned Monahan that further abuse of sick leave would result in

suspension without pay. Undeterred, Monahan remained recalcitrant, and, in May 1999, he was suspended for fifteen days without pay for abuse of sick leave. Monahan grieved his suspension pursuant to the collective bargaining agreement between PHA and his union.

In December 1999, while awaiting an arbitration hearing on the grievance of the May suspension, Monahan was terminated because he continued to abuse sick leave and for excessive absences without leave. Monahan also grieved the firing through his union. Apparently, the grievances were consolidated for hearing, and, on February 25, 2000, prior to an arbitration hearing on both grievances, the parties reached a settlement that was reduced to writing. Under the terms of the settlement, Monahan agreed to withdraw his demand for arbitration and his claim for back pay. PHA agreed to allow Monahan to return to his position. Significantly, the parties also agreed that Monahan would serve a one-year probationary period, during which any infraction of a PHA rule would be cause for immediate termination. In addition, Monahan agreed that if he were found to have violated of the February 25 agreement during the probationary period, he would waive any rights he may have had under the "Collective Bargaining Agreement [3] and/or any state, federal, or local ordinance or regulation pertaining to [his] employment."[4] PHA agreed to re-

---

2. Because of Monahan's death during the pendency of this case, the claim for reinstatement was withdrawn.

3. Before the agreement of February 25, 2000, Monahan enjoyed the status of a regular employee of the Pawtucket Housing Authority (PHA), and, thus was covered by the collective bargaining agreement between the PHA and the Local Union 1217 of the Laborers' International Union of North America.

4. The February 25 agreement provides, in relevant part:

"Whereas, the Parties have attempted to resolve their differences with respect to the termination of Mr. Patrick Monahan, it is agreed by and between the parties as follows:

"1. The Pawtucket Housing Authority agrees to reinstate Patrick Monahan to his regular position and shift providing that Mr. Monahan reports fit for duty. Mr. Monahan shall report to the Executive Director, Mr. Girouard, for assignment on February 23, 2000 at the beginning of his shift.

move the December 1999 termination letter from Monahan's file upon successful completion of one year under this probationary status.

Unfortunately, in June 2000, Monahan once again drew his employer's ire regarding the use of sick leave. Under PHA rules, an employee is required to inform the employer of his intention to use a sick day by no later than 9 a.m. on the morning of the expected absence.[5] On the morning of June 23, 2000, at 9:15, Monahan called in sick to work, a clear violation of the PHA rules. Although this seemingly minor infraction may have been enough to justify Monahan's termination under the February 25 agreement, he was not fired. Instead, he was given a three-day suspen-sion to be served from June 25 to June 28, 2000. As in the past, Monahan's superiors cautioned him that any further infractions would result in immediate termination.

Sometime during the three-day suspension, Monahan called his employer and asked to use one day of his accrued vacation time to respond to a summons to appear in Family Court on June 29, 2000.[6] Because his supervisor determined that PHA already was understaffed in Monahan's job classification, his request for a vacation day was denied. On the morning of June 29, 2000, Monahan called in to work to again press for a vacation day. However, this renewed request met with a similar fate, and Monahan was ordered to report to work.[7] Maintaining that he was

> "2. Mr. Monahan agrees to waive any right, claim, or title which he may have to back pay.
> "3. Mr. Monahan will receive a thirty (30) day suspension for those matters addressed in his dismissal, which will run from January 24 to February 23, 2000. The Union shall withdraw its demand for arbitration dated 7/9/99.
> "4. Mr. Monahan shall serve a one (1) year probationary period starting on the day he returns to work. He will, for that period of time, waive any claim he may have to seniority rights.
> "5. Any infraction of rules, regulations, insubordination, insolence, or unexcused absence from work shall be a basis for immediate termination.
> "6. Upon successful completion of his one (1) year probationary period and the requirements of this agreement, the letter of termination dated 12/27/99 shall be removed from his file and so documented to Mr. Monahan and the Union.
> "7. If it is determined by the employer that Patrick Monahan has violated any terms of this agreement, he shall waive all rights under the Collective Bargaining Agreement and/or any state, federal, or local ordinance or regulation pertaining to this employment."

**5.** Section 51–5(B)(1)(b) of the PHA personnel policy states that "[a]ll employees shall notify the Central Office by telephone each day in case of sickness or any other reason for not being able to report for assigned work no later than 9:00 a.m. * * *."

**6.** Monahan alleges that he told his immediate superiors of the Family Court summons. However, three of Monahan's superiors denied that he said anything about it to them.

**7.** Monahan maintains that on the morning of June 29, after being denied use of his vacation time to go to court, he requested use of his sick time as an alternative and was denied that, as well. The record, however, is unclear about whether Monahan actually made such a request. Paragraph 6 of Monahan's affidavit says:

> "I was still in severe pain when the suspension was to have ended on June 29, 2000. I requested to use a vacation day to attend Family Court. I was refused the use of a vacation day and was terminated when I did not appear for work due to the pain in my back, together with the scheduled Court appearance."

And paragraph 6 of his supplemental affidavit reads:

> "On June 29, 2000, before 9:00 a.m., I telephoned the Housing Authority to call in my absence as I would have called in a sick day. I informed the Authority that I needed to attend Family Court. I was switched to

compelled to go to court, however, Monahan did not report to work. Instead, he attended court and returned home at the conclusion of the proceeding. When Robert Girouard, the executive director of PHA, became aware of Monahan's unexcused absence from work, he fired him under the terms of the February 25 agreement.

Monahan was notified of his discharge by a letter sent that very day. Maintaining that his absence was excused, Monahan sought a hearing before PHA's board of commissioners. But, on September 11, 2000, the board denied his request in a letter from its counsel that endorsed Girouard's determination as final, and cited the February 25 agreement as dispositive. Monahan filed a grievance with his union, but the union declined to press it on Monahan's behalf.

Monahan then filed suit in Superior Court against PHA, its agents and commissioners, in both their official and individual capacities, as well as against his union.[8] His complaint alleged wrongful termination, violation of substantive and procedural due process rights, and breach of contract by PHA. Monahan sought back pay, reinstatement, and damages. After some discovery was conducted, PHA moved for summary judgment on all counts in the complaint directed at it and its agents and members. Monahan filed a cross-motion for summary judgment solely on the issue of PHA's liability. A motion

justice of the Superior Court granted defendant's motion for summary judgment and denied Monahan's cross-motion. Judgment was entered pursuant to Rule 54(b) of the Superior Court Rules of Civil Procedure. Monahan timely appealed.

## Standard of Review

 When reviewing a grant of summary judgment, this Court conducts a *de novo* review and employs "[t]he same standards applicable to the trial justice." *Town of Cumberland v. Rhode Island Interlocal Risk Management Trust, Inc.,* 860 A.2d 1210, 1214 (R.I.2004). Thus, we will affirm the granting of summary judgment "only if, after reviewing the evidence in the light most favorable to the nonmoving party, we conclude that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *Tanner v. Town Council of East Greenwich,* 880 A.2d 784, 791 (R.I.2005). Questions of law are also reviewed *de novo. East Providence School Committee v. Smith,* 896 A.2d 49, 51 (R.I.2006).

## Analysis

Monahan presents three arguments on appeal. First, he contends that his termination was wrongful because Robert Girouard, executive director of PHA, had no authority to fire him without the approval of the board. Second, Monahan assigns

---

James Goff. He denied me the use of a vacation day to attend the Court hearing on June 29, 2000 to which I had been summonsed and subpoenaed. This denial was contrary to and in violation of all past practices and the understanding that I would be allowed to use vacation time when necessary to attend Court hearings."
In neither affidavit does Monahan explicitly allege that he asked for sick leave on June 29, 2000. Instead, he makes three independent assertions: first, that his request for a vacation day to attend court was denied; second,

that his request was made at the same time of the morning that requests for sick leave were due; and, third, that he happened to be injured at the time of his request. Even when viewed in a light most favorable to Monahan, these assertions are, at best, ambiguous with regard to whether he actually ever asked for sick leave on the morning of June 29, 2000.

8. Monahan sued his union for failing to represent him when it refused to press his grievance of the June 29 termination by Girouard. Because that suit remains pending, no issues relative to that litigation are before us today.

error to the motion justice's ruling that he was not entitled to a hearing to dispute the grounds for his termination. Finally, he urges that the motion justice erred when she ruled that the individual members of the board were qualifiedly immune from suit for their alleged deprivation of plaintiff's procedural due process rights.

### Girouard's authority to terminate

■ The plaintiff argues that his termination was invalid because § 51–1(B) of the PHA personnel policy does not specifically authorize the executive director to terminate employees. We are not persuaded by this argument.

Section 51–1(B) of the PHA personnel policy states:

"The Executive Director shall have the primary responsibility of enforcement of the provisions and purpose of this personnel policy. The Executive Director shall have the authority to hire, promote, transfer, demote and *separate* all personnel subject to the review and approval of the Board of Commissioners and the regulation herein outlined." (Emphasis added.)

The plaintiff contends that it is significant that the policy does not employ the words "terminate" or "fire" in its recitation of authorized actions available to the executive director, using the word "separate" in its place. The plaintiff asks us to hang our judicial hats on this linguistic hairsplitting and hold that, without the word "terminate" being explicitly included in § 51–1(B), the executive director's authority to "separate" PHA personnel does not include the power to terminate them. Logic, however, militates against such a conclusion.

When read in the context of the executive director's authority with respect to employment decisions, the term "separate" can mean nothing other than the authority to terminate employment. To construe the word "separate" to include less than the power to terminate would be to render it meaningless.

We find equally unpersuasive the argument that the words "subject to the review and approval of the Board of Commissioners" make the exercise of the executive director's powers under § 51–1(B) ineffective until ratified by the board. That section of the regulation speaks of the executive director's "authority" to make employment decisions. To hold his decisions ineffective without board approval, would strip him of that authority. The better interpretation, as defendants suggest, is that § 51–1(B) gives the board the prerogative to approve or overrule the executive director's decision if it deems necessary. In our opinion, Girouard was fully cloaked with the authority to terminate Monahan.

### Entitlement to a hearing

■ The plaintiff offers two arguments to support his claim that he was entitled to a pre-termination hearing.

First, Monahan grounds his claim on a textual analysis of the February 25 agreement. According to plaintiff, the absence of any language in the agreement setting forth the manner in which PHA rule violations would be determined renders the agreement ambiguous in that respect. Such ambiguity, he argues, must be resolved against the PHA, the drafter of the agreement. He therefore construes the agreement as meaning that he retained a right to contest a determination that he had violated any PHA rules. In other words, plaintiff asserts that by signing the waiver agreement he waived only the right to dispute his *termination* once a decision was made that he had violated PHA rules. He maintains that he did not waive his

right to a hearing to determine *whether* the violation had occurred. We disagree.

■ It is well settled that when this Court is called upon to consider the clarity of any agreement, " 'the document must be viewed in its entirety and its language be given its plain, ordinary and usual meaning.' " *Rotelli v. Catanzaro,* 686 A.2d 91, 94 (R.I.1996). When ambiguity is present, and the document's language is susceptible to more than one reasonable interpretation, the language will be strictly construed with all ambiguities decided against the drafter. *See Employers Mutual Casualty Co. v. Pires,* 723 A.2d 295, 298 (R.I. 1999). When, however, no such ambiguity exists, "judicial construction is at an end for the terms will be applied as written." *Rivera v. Gagnon,* 847 A.2d 280, 284 (R.I. 2004).

We have analyzed the February 25 agreement and see no ambiguity. Paragraph 5 of the document says that during plaintiff's probationary period, "any infraction of rules, regulations, insubordination, insolence, or unexcused absence from work shall be a basis for immediate termination." Paragraph 7 reads, "[i]f it is determined by the employer that Patrick Monahan has violated any terms of this agreement, he shall waive all rights under the Collective Bargaining Agreement and/or any state, federal, or local ordinance or regulation pertaining to this employment." When read together, these two paragraphs can only mean that Monahan waived "all rights * * * pertaining to [his] employment" upon a determination by his employer that he had "violated" the terms of the February 25 agreement. Thus, under the plain meaning of the words of the agreement, Monahan's waiver became effective upon the determination by the PHA that he had violated the agreement—i.e., that he had broken the PHA rules. In our opinion, PHA's decision that Monahan's conduct had contravened the agreement was neither arbitrary nor capricious.

In *McGee v. Stone,* 522 A.2d 211 (R.I. 1987), this Court upheld the validity of a waiver agreement similar to the one involved here. There, a public employee (McGee), facing suspension on a charge of larceny, was allowed to continue his employment because he signed a waiver agreement that placed him on probationary status. Under the waiver, McGee agreed that if he were fired during the probationary period, he would waive "any and all rights [he] may have * * * to contest the dismissal." *Id.* at 213. After he was fired while still on probation, McGee sought to challenge the validity of his waiver. We held that the waiver agreement was entered into voluntarily, and therefore was valid. We reasoned that because McGee unquestionably understood his right to a hearing under state law on the larceny charges, his voluntary waiver of that right, and his right to dispute his termination during the probationary period, constituted the "punishment imposed for the [earlier] crimes." [9] *Id.* at 215. Similarly, plaintiff was well aware of, and indeed had taken steps to exercise, his contractual right to arbitrate the December 1999 termination. In an effort to avoid an unfavorable arbitration decision, plaintiff voluntarily, and with the assistance of his union representative, waived that right and his rights to a hearing concerning any future violations of PHA rules, in the February 25 agreement. The plaintiff cannot now sidestep the penalty to which he voluntarily agreed. Thus, "[t]he

9. McGee was a member of the state police who had rights to a disciplinary hearing under the Law Enforcement Officers' Bill of Rights, G.L.1956 chapter 28.6 of title 42. *McGee v. Stone,* 522 A.2d 211, 213, 215 (R.I. 1987).

settlement reached under the terms of the waiver is as conclusive of the parties' rights as is a judgment that terminates the litigation between them." *Id.*

The plaintiff further argues that his absence on June 29, 2000 was excused, and he points us to factual disputes in the record regarding the circumstances surrounding that incident. We agree with plaintiff that, generally, such factual ambiguities are grist for the fact-finding mill and render summary judgment inappropriate. Here, however, because we conclude that Monahan waived his right to dispute whether his absence was justified, and because he raised no genuine issue of material fact concerning the validity of his waiver, summary judgment was appropriate.

 Second, plaintiff contends that he had a property interest in his job and was therefore entitled to a pre-termination hearing under the United States Supreme Court's holding in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). In *Loudermill*, two Ohio public employees were discharged and were denied pre-termination hearings. Under an Ohio statute, the employees were "classified civil service employees" who could be terminated only "for cause." *Id.* at 535, 105 S.Ct. 1487. The Court concluded that, for those so classified, this statute conferred a constitutionally protected property interest in the continuation of employment, and further held that due process "requires 'some kind of hearing' prior to the discharge of an employee who has [such an] * * * interest in his employment." *Id.* at 542, 105 S.Ct. 1487. We need not reach this issue, however, because we conclude that Monahan validly waived his rights to any due process hearing to which he otherwise may have been entitled. "It is well settled that we will refrain from passing on a constitutional question when it is clear that the

case before us can be decided on another point and that a determination of such a question is not indispensably necessary for a disposition of the case." *McGee*, 522 A.2d at 215.

In a nutshell, once PHA had determined that Monahan had violated its personnel rules, the waiver that he signed to avoid the previous termination effort stripped him of any right to dispute that decision. The rights Monahan waived were those "under the Collective Bargaining Agreement and/or any state, federal, or local ordinance or regulation pertaining to [his] employment." (Letter of Agreement par. 7.) We are satisfied that this language is broad enough, and clear enough, to constitute a waiver of any rights Monahan may have had to a hearing either under the Due Process Clause of the United States Constitution, or under the collective bargaining agreement. We therefore hold that under the terms of the February 25 agreement, plaintiff was not entitled to either a pre- or post-termination hearing to dispute the decision by the PHA that the agreement had been violated.

### Qualified immunity of PHA commissioners

 Monahan avers that when it denied him a termination hearing, the board violated his due process rights, entitling him to damages under 42 U.S.C. § 1983. He further asserts that the board acted unreasonably when it denied him a hearing, thus depriving its members of any potential immunity. The defendants counter that they are qualifiedly immune from civil damages as governmental officials performing discretionary functions. Our conclusion that Monahan waived any right to a post-termination due process hearing, however, renders this argument moot. Government officials need not avail themselves of the protections of qualified immu-

nity when no constitutional violation is present.

In *Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999), the United States Supreme Court stated that "government officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Id.* at 609, 119 S.Ct. 1692 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). But the first step in evaluating a claim to qualified immunity is to "determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all * * *." *Id.* (quoting *Conn v. Gabbert,* 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999)). When no such deprivation has occurred, as is the case here, the analysis ends, and the need for immunity no longer exists.

### Conclusion

For the foregoing reasons, we affirm the judgment of the Superior Court, and return the record of this case thereto.