David H. HAFFENREFFER, in his Capacity as Co–Executor of the Estate of Carolyn B. Haffenreffer

v.

Karl HAFFENREFFER, in his Capacity as Co–Executor of the Estate of Carolyn B. Haffenreffer et al.

No. 2008–276–Appeal.

Supreme Court of Rhode Island.

May 18, 2010.

William R. Landry, Esq., Providence, RI, for Plaintiff.

R. Daniel Prentiss, Esq., for Defendant.

Present: GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

Justice ROBINSON for the Court.

This case comes before us on the defendant's appeal from two grants of summary judgment entered in accordance with Rule 56 of the Superior Court Rules of Civil Procedure in favor of the plaintiff, David H. Haffenreffer. The defendant, Karl Haffenreffer, raises two principal issues on appeal. First, Karl[1] contends that the hearing justice in the Superior Court erred in ruling (a) that an offer document authored by the coexecutors administering the Estate of Carolyn B. Haffenreffer was clear and unambiguous and should be understood as David would have it and (b) that the offer document correspondingly precluded Karl from using a credit, against his anticipated share in Carolyn's overall estate, as a portion of the purchase price in acquiring three parcels of real estate from the estate. Secondly, Karl contends in the alternative that the hearing justice erred in failing to order a reformation of the offer document so as to comport with the actual preexisting intention of the coexecutors, at whose behest the offer document was drafted. For the reasons set forth below, we reverse and vacate the judgment of the Superior Court.

## I

### Facts and Travel

David and Karl are brothers. Their mother, Carolyn B. Haffenreffer, passed

---

1. For the sake of simplicity, we shall frequently refer to members of the Haffenreffer family by their first names. We of course intend no disrespect.

away on December 13, 2003. Carolyn's estate plan was reflected in a will executed in 1995. Having set forth a plan for the distribution of her probate estate, Carolyn's will then provided that the residue and remainder of her estate should be transferred, or should pour over, into a trust established in 1982 and subsequently amended some sixteen times, most recently in 1999 (the Trust Agreement or trust). Carolyn's will named David and Karl as coexecutors of her estate; it also provided that Attorney Noel M. Field, Jr. should serve as a coexecutor.[2]

## A

### The Probate Estate

Carolyn's probate estate consisted mainly of various parcels of real property and various items of personal property. Carolyn bequeathed all her tangible personal property in roughly equal shares to be divided amongst Karl, David, and David's wife. Carolyn directed that three parcels of real estate in Little Compton be devised to David. She also instructed the coexecutors to sell one parcel of real estate on Congdon Street in Providence.[3]

Additionally, Carolyn directed the coexecutors to sell several other parcels of real estate located in Little Compton; it is these parcels that lie at the core of the instant controversy. Section 10 of the will governed the preconditions for the sale of these parcels. Essentially, section 10 required that the coexecutors first offer to sell the parcels to a select group of family members for "the lowest price which the seller would be willing to accept for such parcel;" then, if any of the parcels remained unsold, the coexecutors were to offer them for sale to the public.

## B

### The Trust Agreement

Carolyn's will provided that the residue and remainder of her estate should be transferred into her trust. Carolyn had established in 1982 a Trust Agreement with Fleet National Bank (now Bank of America) to serve as trustee.[4] The Trust Agreement provided that, after accounting for taxes, debts, and expenses, Karl would receive one-third of the remainder of the estate and David would receive the balance.

In May of 2004, several months after Carolyn's death, Attorney Field (one of the coexecutors) created a spreadsheet to better explain what assets would ultimately constitute the Overall Estate[5] and would be distributed in accordance with the Trust Agreement. He opined that the value of the assets would amount to a total sum of $29,442,438.70. After deductions for estate taxes, specific gifts, and expenses, Attorney Field calculated that $11,847,788.13 would be available to Karl and David. Ultimately, Karl could expect to receive approximately $3.9 million and David could expect to receive approximately $7.9 million. This estimate was updated in May of 2005 so as to indicate that Karl

---

**2.** Noel M. Field, Esq. was named as a defendant in his capacity as a coexecutor of the Estate of Carolyn B. Haffenreffer. He is, however, only a nominal defendant in this action.

**3.** The three particular parcels of real estate in Little Compton that were devised to David are not at issue in the instant case, nor is the parcel on Congdon Street in Providence.

**4.** Bank of America was originally a defendant in this action, but that institution has since been dismissed.

**5.** In this opinion, the term "Overall Estate" refers to the probate estate coupled with the assets encompassed by the Trust Agreement.

could expect to receive approximately $4.1 million and that David could expect to receive approximately $8.3 million.

## C

### The Offer Document

On March 2, 2005, the three coexecutors (Karl, David, and Attorney Field) caused to be created a document (Offer Document) that would be used to facilitate the sale of the six Little Compton parcels as directed by Carolyn's will; in that document, the coexecutors mutually agreed to sell the six parcels in four saleable units. The Offer Document permitted Karl, David, and David's three children to make offers to purchase the four units in accordance with section 10 of Carolyn's will. What ultimately lies at the heart of the instant dispute is the language in the so-called "credit provision" of the Offer Document which sets forth the terms of payment for the units. That provision reads as follows:

> "Payment shall be made in the form of cash, certified check, bank check or wire transfer, with or without financing, excepting however, seller financing, in the full amount of the purchase price, subject to customary adjustments and prorations as of the date of transfer and subject to adjustment or credit for shares or amounts due to such offeree from the Estate of Carolyn B. Haffenreffer pursuant to the terms of the Will."

The Offer Document required that any family member who wished to purchase a unit return his or her response by May 2, 2005.

On May 2, 2005, Karl submitted his response to the Offer Document—accepting the offer by indicating that he wished to purchase three specific units of the four that had been offered; those three units had been appraised as having a total value of $5,215,500. Karl indicated that he would pay most of the purchase price by using, in the form of a credit, the approximately $4.1 million that was due to him from Carolyn's Overall Estate to be distributed in accordance with the Trust Agreement.[6]

Almost a month later, on June 1, 2005, Attorney Field responded to Karl's acceptance of the coexecutors' offer to sell the parcels. Attorney Field did so in a memorandum to the coexecutors and their counsel; he asserted that the credit provision set forth in the Offer Document did not permit Karl to purchase the three units by using a credit reflective of the amount due to him from the Overall Estate. Attorney Field indicated that Karl would have to pay for the properties in the form of cash, certified check, bank check, or wire transfer.

Less than a week later, on June 7, 2005, Karl, through his attorney, responded to Attorney Field and David, demanding that the sale take place and asserting that he was entitled to use a credit reflective of the amount due to him from Carolyn's Overall Estate. It is undisputed that David and Attorney Field, in their capacities as coexecutors, ultimately refused to consummate the sale.

## D

### The Superior Court Actions

On May 6, 2005, David commenced the instant action in Newport County Superior Court by filing a verified complaint seek-

---

**6.** Karl indicated that he would pay the remaining $1,115,500 of the purchase price in cash by means of funds from a bank in Maine.

ing (1) a declaratory judgment and (2) a temporary restraining order to prevent the sale of the properties. On June 22, 2006, David filed an amended verified complaint, again requesting declaratory relief pursuant to the Uniform Declaratory Judgments Act.[7] In count 3 of his amended complaint, David sought a declaration that Karl had breached the contract to purchase the three units because he had failed to "close on the properties within the time set forth in the Will (as extended by agreement of the Co–Executors) [which] * * * negates the Estate's duty to sell him *any* of the subject parcels."

Karl answered the amended complaint and also filed a counterclaim and cross-claim, asserting that it was David and Attorney Field who, when they refused to convey the three parcels to him, had breached the contract that had come into existence when he accepted the offer set forth in the Offer Document. Karl contended that, in drafting the Offer Document, the coexecutors had intended that the credit provision in the Offer Document would allow him to use his intended distribution from Carolyn's Overall Estate as a credit for a portion of the purchase price. The parties thereafter filed cross-motions for summary judgment.

On May 3, 2007, the parties appeared in Superior Court and participated in a hearing on their cross-motions for summary judgment. On July 27, 2007, the hearing justice issued a written decision and ruled that the credit provision clearly and unambiguously permitted Karl to use a credit from his anticipated share of Carolyn's probate estate only—and **not** from the Overall Estate. Notably, the hearing justice stated that she did not "resort to analysis of extrinsic evidence" in reaching her decision; after having made reference to the parole evidence rule, she expressed

her view that such analysis would be "both unnecessary and impermissible." She therefore granted summary judgment in favor of David with respect to count 3 of his amended verified complaint.

In the wake of the just-referenced ruling, Karl was granted leave to amend his counterclaim. He then added a count 3 to his original counterclaim. In count 3 of Karl's counterclaim, he sought reformation of the contract on the basis of mutual mistake; he again argued that the coexecutors had intended that, in purchasing such parcels as he might choose to purchase, he could use a credit from his expected share of the Overall Estate. David and Karl again filed cross-motions for summary judgment.

On May 23, 2008, the same hearing justice as had ruled on the earlier cross-motions addressed the most recent cross-motions for summary judgment; she once again ruled in favor of David and declined to allow reformation of the contract. The hearing justice again declared that the Offer Document was clear and unambiguous and should be understood as David would have it. She held that the phrase "pursuant to the terms of the Will" in that document meant that, in seeking to purchase the subject properties, Karl was entitled to use a credit only with respect to his shares of Carolyn's probate estate and **not** with respect to shares due to him from the Overall Estate as would be distributed in accordance with the Trust Agreement. The hearing justice also found no evidence of mutual mistake, stating that "[the coexecutors] understood the terms of payment * * * in the offer document to read and mean exactly what [was] stated as written." Partial final judgment was entered in accordance with Rule 54(b) of the Superior Court Rules of Civil Procedure on

7. G.L.1956 § 9–30–1.

July 18, 2008. Karl filed a timely notice of appeal.

## II

### Standard of Review

This Court employs a *de novo* standard in reviewing a hearing justice's decision on a motion for summary judgment pursuant to Rule 56 of the Superior Court Rules of Civil Procedure. *Estate of Giuliano v. Giuliano*, 949 A.2d 386, 391 (R.I.2008). We carry out such a review in the same manner as did the hearing justice, "reviewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party." *Fiorenzano v. Lima*, 982 A.2d 585, 589 (R.I. 2009); *see also Planned Environments Management Corp. v. Robert*, 966 A.2d 117, 121 (R.I.2009); *Chavers v. Fleet Bank (RI), N.A.*, 844 A.2d 666, 669 (R.I.2004). This Court "will affirm a summary judgment if there is no genuine issue of material fact and we conclude that the moving party is entitled to judgment as a matter of law." *O'Sullivan v. Rhode Island Hospital*, 874 A.2d 179, 182 (R.I.2005); *see also Alves v. Hometown Newspapers, Inc.*, 857 A.2d 743, 750 (R.I.2004).

Further, since the instant dispute involves contract interpretation, it should be recalled that "this Court reviews the trial justice's interpretation of contracts *de novo.*" *Zarrella v. Minnesota Mutual Life Insurance Co.*, 824 A.2d 1249, 1259 (R.I.2003). In addition, whether or not a contract is ambiguous is a question of law. *Gorman v. Gorman*, 883 A.2d 732, 738 n. 8 (R.I.2005); *see also Young v. Warwick Rollermagic Skating Center, Inc.*, 973 A.2d 553, 558 (R.I.2009). Accordingly, our review of the hearing justice's ruling as to that issue is conducted on a *de novo* basis. *Young*, 973 A.2d at 558.

## III

### Analysis

On appeal, Karl contends that the hearing justice should not have granted summary judgment in David's favor. He asserts that the credit provision in the Offer Document is ambiguous, in that (in his view) it is susceptible to more than one possible meaning. Karl further contends, however, that there is only one *reasonable* interpretation of that provision—*viz.*, that the provision contemplates a credit being taken with respect to the Overall Estate and not just Carolyn's *probate estate* (as is contended by David). Karl further alleges error in the hearing justice's failure to look to extrinsic evidence in interpreting the provision in question. Karl contends that extrinsic evidence demonstrates that, at the time of the drafting of the Offer Document, the coexecutors intended that the credit provision refer to the Overall Estate. Karl therefore asserts that summary judgment should have been granted in his favor.[8]

For the reasons that follow, it is our conclusion that the phrase "Estate of Carolyn B. Haffenreffer" as used in the credit provision of the Offer Document unambiguously refers to Carolyn's Overall Estate.[9]

---

8. We note that the instant case "is a case in which the [Super.R.Civ.P.] 56 option was entirely appropriate; there was no dispute between the parties as to the material facts, but rather only as to the legal conclusion to be drawn." *See O'Sullivan v. Rhode Island Hospital*, 874 A.2d 179, 183 (R.I.2005).

9. It is undisputed that a contract was created when Karl submitted his response to the Offer Document; he thereby accepted (with respect to three of the four offered units) the coexecutors' offer to sell the units. *See* E. Allan Farnsworth, *Farnsworth on Contracts* § 3.13 (3d ed.2004); *see also* 17A Am.Jur.2d *Contracts* § 1 (2009). Thus, our analysis of the

The credit provision expressly allows an offeree who is a potential purchaser to make payment through an "adjustment or credit for shares or amounts due to such offeree from the Estate of Carolyn B. Haffenreffer pursuant to the terms of the Will." Our case law is clear that "instruments referred to in a written contract may be regarded as incorporated by reference and thus may be considered in the construction of the contract." *Rotelli v. Catanzaro*, 686 A.2d 91, 94 (R.I.1996). Accordingly, since the Offer Document expressly references the will, we shall look to the language of Carolyn's will as we construe the just-quoted provision of the Offer Document.

■ In reviewing the terms of Carolyn's will, it is immediately apparent that the will transfers a large portion of the decedent's estate to a trust, as Carolyn's will expressly provides that the residue and remainder of her estate should be transferred "to Fleet National Bank as trustee under [Carolyn's] 1982 Trust Agreement * * *." In the law of wills and trusts, such a provision is commonly referred to as a pour-over provision. *See, e.g., Filippi v. Filippi*, 818 A.2d 608, 615 (R.I.2003); *see also Notarantonio v. Notarantonio*, 941 A.2d 138, 141 (R.I.2008). When such a

pour-over provision is utilized, the decedent's will and her trust become inextricably linked. *See Merrill v. Boal*, 47 R.I. 274, 283, 132 A. 721, 725 (1926) ("Very frequently a trust agreement * * * is later incorporated by reference into a will and serves as a part thereof."); *see also* 79 Am.Jur.2d *Wills* § 196 (2009) ("[T]he general rule of incorporation by reference is applicable to permit the incorporation in a will wherein a bequest is made in trust of an extrinsic trust instrument to supply the terms of the trust."). Since it employs a pour-over provision, Carolyn's will not only provides for the distribution of her probate estate, but it also directs that a large portion of her estate be distributed through a trust. Therefore, it is our conclusion that the shares to which Karl is entitled "pursuant to the terms of the Will" include shares from Carolyn's probate estate *and* from her trust.[10] Accordingly, we hold that the term "Estate of Carolyn B. Haffenreffer" as used in the credit provision of the Offer Document unambiguously refers to Carolyn's Overall Estate. Consequently, we further hold that, in purchasing the three units that he wished to purchase, Karl was entitled to use, in the form of a credit, the amount due to him from the Overall Estate.[11]

---

language in the Offer Document's credit provision will be "governed by the well-settled rules on the interpretation of contracts." *See McBurney v. Teixeira*, 875 A.2d 439, 443 (R.I. 2005) (internal quotation marks omitted).

10. Further, an interpretation of the credit provision as referring only to Carolyn's probate estate would render the provision meaningless, as Attorney Field stated in his memorandum of June 1, 2005 to the coexecutors and their counsel:

"As the will leaves the entire residue of the probate estate (which includes the proceeds of any sale of real estate) to a trust, *there are no adjustments or credits for shares or amounts due to any offeree from the [pro-*

bate] *estate of Carolyn B. [Haffenreffer].*" (Emphasis added.)

11. Although the dissent proclaims that we have departed in this case from Rhode Island's "long-standing" and "venerable" contract interpretation doctrines, that charge is without foundation. Conducting the requisite *de novo* review of the Superior Court's summary judgment ruling, it became clear to us that the "pursuant to the terms of the Will" phrase in the Offer Document required us to look to the language of the will. An examination of the will immediately reveals that it contains a "pour-over" provision and that therefore Carolyn's will and trust are inextricably linked. This is a *complex* analysis, but it is in no way unfaithful to this state's long-

Even though what we have written thus far suffices to resolve the instant controversy, we believe it worthwhile to note that our interpretation of the credit provision as unambiguously allowing Karl to use as a credit his shares from Carolyn's Overall Estate is entirely consistent with the intentions of the parties in preparing the Offer Document, as reflected in the copious extrinsic evidence in the record. This Court has long held that, in construing the terms of a contractual provision, our primary objective is to ascertain the intent of the parties. *The Elena Carcieri Trust–1988 v. Enterprise Rent–A–Car Co. of Rhode Island,* 871 A.2d 944, 947 (R.I.2005). With respect to determining the intent of the parties, this Court in *Hill v. M.S. Alper & Son, Inc.,* 106 R.I. 38, 256 A.2d 10 (1969) quite clearly summarized as follows certain basic principles:

"In interpreting [an] instrument it is basic that the intention of the parties must govern if that intention can be clearly inferred from its terms and can be fairly carried out consistent with settled rules of law. * * * In ascertaining what the intent is we must look at the instrument as a whole and not at some detached portion thereof. * * * *And, although there is no ambiguity, we will nonetheless consider the situation of the parties and the accompanying circumstances at the time the contract was entered into,* not for the purpose of modifying or enlarging or curtailing its terms, but to aid in the interpretive process and to assist in determining its meaning." *Id.* at 47, 256 A.2d at 15 (emphasis added).

■■■ Accordingly, this Court may "consider extrinsic evidence where relevant to prove a meaning to which the language of the instrument is reasonably susceptible * * *." *Harrigan v. Mason & Winograd, Inc.,* 121 R.I. 209, 213, 397 A.2d 514, 516 (1979); [12] *see also LPP Mortgage. Ltd. v. Sugarman,* 565 F.3d 28, 31–32 (1st Cir.2009).[13]

The pertinent extrinsic evidence (much of it consisting of sworn testimony by David and by Attorney Field and members of Attorney Field's law firm) indicates that, until some point in time *after* the

standing and venerable doctrines governing contract interpretation.

12. In his opinion for the Court in the case of *Harrigan v. Mason & Winograd, Inc.,* 121 R.I. 209, 213, 397 A.2d 514, 516 (1979), Justice Weisberger cited approvingly to the seminal case of *Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 69 Cal.Rptr. 561, 442 P.2d 641 (1968).

We consider the following language from the opinion of Chief Justice Traynor of the Supreme Court of California in the *Pacific Gas* case to be particularly enlightening:

"A rule that would limit the determination of the meaning of a written instrument to its four-corners merely because it seems to the court to be clear and unambiguous, would either deny the relevance of the intention of the parties or presuppose a degree of verbal precision and stability our language has not attained." *Pacific Gas,* 69 Cal.Rptr. 561, 442 P.2d at 644.

13. The hearing justice declined to look at extrinsic evidence in conducting her analysis of the hermeneutic problem that this case poses; David has contended that the parol evidence rule barred the hearing justice from considering such evidence, since she did not find the credit provision of the Offer Document to be ambiguous on its face. It is true that "the parol evidence rule bars the admission of any previous or contemporaneous oral statements that attempt to modify an integrated written agreement." *Garden City Treatment Center, Inc. v. Coordinated Health Partners, Inc.,* 852 A.2d 535, 542 (R.I.2004). It is our judgment, however, that the parol evidence rule is inapplicable to the instant case, since the extrinsic evidence at issue is being used to provide insight into the parties' intent at the time of the drafting of the credit provision, and not to *modify* or *contradict* its terms. *See Hill v. M.S. Alper & Son, Inc.,* 106 R.I. 38, 47, 256 A.2d 10, 15 (1969).

Offer Document was tendered and then accepted by Karl, all parties understood the term "Estate of Carolyn B. Haffenreffer" to refer to the Overall Estate.

The transcript of the deposition of Attorney Field that was conducted on July 28, 2005 contains the following significant dialogue:

"Q. But back in March, when you as a co-executor, made the offer * * * your understanding of the meaning of the phrase taking credit against shares and so forth, your understanding of that and your intention of that was that the share would be the share against the entire estate, including the trust?

"A. Yes * * *."

Similarly, in his deposition taken on August 2, 2006, David acknowledged that he understood the credit provision of the Offer Document as referring to "the trust and the will put together." [14]

In addition, Attorney David I. Lough (the lawyer in Attorney Field's office who actually drafted the Offer Document) stated in an affidavit that he drafted the credit provision of the Offer Document "with the objective of carrying out the intention of the executors * * * as [he] understood it." Attorney Lough stated that his understanding of the intention of the coexecutors was as follows:

"The executors stated that they would permit a family member who was a beneficiary of Mrs. Haffenreffer to utilize a credit if available for amounts due from the estate to pay for such a purchase. I did not hear any executor, or any other person, state at this meeting, or at any other time, that he intended that the credit was to be limited to amounts due from Mrs. Haffenreffer's probate estate, as opposed to the assets that were in Mrs. Haffenreffer's Trust. I cannot recall any executor or any other person ever distinguishing between these two aspects of Mrs. Haffenreffer's estate."

Despite the prior understanding of the parties, David acknowledged in his deposition that he took the position that Karl could not use a credit from his anticipated distribution from Carolyn's Overall Estate at the time "when Karl made his election to accept the offers of the property and tried to use his share from the trust as part of the purchase price." [15]

In summary, we conclude as a matter of law that the phrase "Estate of Carolyn B. Haffenreffer" unambiguously refers to Carolyn's Overall Estate, and not solely to her probate estate.[16] We thus hold that

14. We also see some significance in the fact that David acknowledged in his deposition that he understood language in a memorandum regarding an unrelated parcel of property to the effect that property "descending to [him] under Section 4 of the will would be allocated as a part of David's share of the estate" as meaning that "that would be taken as a credit against what would be coming to [David] under the trust."

15. We note that in his brief David states that "Karl's Offer Response Form [accepting the offer to purchase three parcels] took David and Attorney Field by complete surprise." At the time the Offer Document was created, they had expected him to purchase only one parcel, which was valued at $93,100–far lower than the $5,215,500 total purchase price for the three parcels Karl eventually opted to purchase. (Significantly, it is apparently undisputed that David and Attorney Field would have allowed Karl to use a credit from Carolyn's Overall Estate for that lesser amount.) However, the inaccurate prediction by David and Attorney Field as to Karl's potential future decisions does not affect our contractual analysis.

16. In view of the conclusion that we have reached as to the meaning of the credit provision, we need not (and therefore do not) reach the issue of contractual reformation,

summary judgment was improperly granted in favor of David on this issue. Rather, in our view, Karl was entitled to summary judgment.

## IV

### Conclusion

For the reasons set forth in this opinion, we reverse and vacate the Superior Court's grants of summary judgment in favor of David. We remand this case to the Superior Court.

Chief Justice SUTTELL did not participate.

Justice INDEGLIA took no part in the consideration or decision of this appeal.

Justice GOLDBERG, dissenting.

I respectfully dissent from the decision of the majority in this case. I disagree with the legal conclusions reached by the majority, the marked departure from settled contract law, and the holding that the Superior Court's grant of summary judgment should be vacated. I would affirm.

In my opinion, the seasoned and well-respected hearing justice who was confronted with this unseemly dispute between two brothers, who not only commissioned the drafting of the offer-document contract, but also were its beneficiaries, issued a twenty-one page decision that was eloquently drafted, well-reasoned, and correct. The hearing justice properly refused to engage in the interpretive acrobatics urged by Karl and that were adopted in the majority decision. The hearing justice found that the controlling language of the so-called "credit provision" was clear and unambiguous and governed its consequences. She then decided, correctly in my opinion, that it was incumbent upon her to enforce the agreement as written.

In accordance with our well-settled law, the hearing justice, quoting 17A C.J.S. *Contracts* § 310 (1990), refused to attempt to ascertain "the actual mental process of the parties or their state of mind when the contract was executed," nor resort to any extrinsic evidence—having found that both routes were unnecessary and impermissible. Significantly, the majority decision ignores the hearing justice's conclusion that this distasteful agreement was clear and unambiguous. Instead, by examining both the will and the trust instruments, the majority reaches the conclusion that the term "Estate of Carolyn B. Haffenreffer" as set forth in the Offer Document, "unambiguously refers to Carolyn's Overall Estate." Further, the majority concludes that the phrase, "pursuant to the terms of the Will" means pursuant to the terms of the will *and* trust instrument—a result that is contrary to our well-established law and a marked departure from our precedent.

In my opinion, the majority decision overlooks what really happened in this case as reflected in the issues and pleadings that were presented to the hearing justice. I particularly am concerned by the failure of the majority to decide the case based on the issues that were preserved, and not those that were not preserved. Is the agreement ambiguous or not? If it is ambiguous—a question of law for the Court—then summary judgment must be vacated and the case remanded for trial. If the agreement is not ambiguous, a conclusion that I have reached, then the judgment is affirmed. A holding that the agreement is not ambiguous, but does not mean what it says is confusing and foreign to our appellate jurisprudence. Consequently, I dissent.

which was the subject of the second cross-    motions for summary judgment.

## The Facts

The decedent executed the will in 1995, and directed how her real and tangible property was to be distributed. She bequeathed her personal tangible property in equal shares to Karl, David, and David's wife. She directed that her home in Providence be sold, and she gave David the option to receive three of her lots in Little Compton. The remaining real estate in Little Compton, consisting of six lots, was not devised to anyone; rather, the decedent directed that these lots be sold (but, in general, first offered to David, Karl, and her grandchildren). Although the will set forth specific instructions about how the sale was to be accomplished, the terms of the sale and the price were left to the coexecutors. Significantly, the will dictated that any offeree who accepts the offer shall make payment of the sale price to the executors *within ninety days after the mailing of the offer*. The majority decision overlooks this tight time frame in its examination of the remaining terms of the will.

The will also contained a provision specifying that the residue of the estate be poured over into a trust, which the decedent established in 1982, and amended numerous times; the final amendment, *the sixteenth,* was amended on December 14, 1999, four years after the will.[17] The will provided that the proceeds from the sale of the real property, after the expenses of administration, be paid into the trust and distributed in accordance with its terms. According to David, such a transfer in lieu of cash would leave the probate estate without sufficient cash to properly close the estate because, under the terms of the will, there are no liquid assets in the estate. The trust had a different, independent trustee (Fleet Bank) such that the probate estate and the trust estate were administered by separate fiduciaries. The record discloses and the hearing justice was advised that, according to David, the assets from the trust had already been distributed when the Offer Document was prepared and signed. Having been apprised of these permutations, the hearing justice refused to look to the extrinsic evidence.

After Carolyn's death in 2003, the coexecutors, having been duly appointed and qualified, entered into an agreement with respect to the sale of the lots in Little Compton. The property was divided into four parcels, designated as (i), (ii), (iii) and (iv); appraisals were obtained and all three fiduciaries agreed upon the Offer Document. The Offer Document set forth precisely how payment was to be made:

> "Payment shall be made in the form of *cash, certified check, bank check* or *wire transfer*, with or without financing, excepting however, seller financing, in the *full amount of the purchase price,* subject to customary adjustments and prorations as of the date of transfer and subject to adjustment or credit for shares or amounts due to such offeree from *the Estate of Carolyn B. Haffenreffer pursuant to the terms of the Will.*" (Emphases added.)

The record before this Court discloses that less than fifteen minutes before the deadline, Karl delivered his acceptance of the offer for three parcels, totaling

---

17. The trust installment recites that the decedent executed the trust agreement in 1982; amended it in 1990 (the Seventh Trust Amendment); executed the Fourteenth Trust Amendment on December 9, 1997, and the Fifteenth Trust Amendment on May 10, 1999. According to the instrument, the sixteenth and final version amended the trust in its entirety.

$5,215,500. Karl's acceptance was unconditional.[18]

However, despite the provision in the Offer Document that expressly prohibited seller financing, and notwithstanding that there were no amounts currently due Karl under the will or the trust, Karl contended that he was entitled to use a "credit" to pay for all of parcel (iv) and some of parcel (i), and intended to pay for the remainder of parcel (i) and all of parcel (ii) by wire transfer.[19] Although the Offer Document required that payment be made in cash, certified check, bank check, or wire transfer, Karl insisted that the money he eventually would receive from the *trust* could be applied as a credit by the *estate*. David disagreed with this contention and argues on appeal that this would have placed the estate in a position of having insufficient cash.

In addition, the will specifically set forth a strict closing schedule for the sale of this real estate—ninety days from offer to payment. A careful reading of the will and the Sixteenth Trust Amendment to the trust instrument—an exercise the hearing justice refused to allow—reveals that Karl wanted to apply a credit against an amount that he was not due under either instrument, but which would become due, in the future, after the probate estate was settled and the trust made its final payment. Before the Superior Court, Karl argued that the trust estate "owe[d]" Karl "*value* equal to one-third of its 'available assets'" and that Karl was "simply taking his *value* in the form of real property." (Emphases added.) According to Karl, the executors were free to distribute to the trust a promissory note, or other docu-

ment, and Karl would then relinquish "an interest in his share of the [t]rust [e]state equal to the credit amount used to pay for [the] property." The executors refused to do so, and the hearing justice also declined to engage in these scenarios.

### The Proceedings Below

It is significant to me that in the Superior Court, neither party sought to have the hearing justice declare the contract to be ambiguous. It is undisputed that before the Superior Court, Karl argued that the contract was not ambiguous and that his interpretation was the only reasonable result. Although Karl argued that the contract was unambiguous, citing *Paolella v. Radiologic Leasing Associates*, 769 A.2d 596 (R.I.2001), he nonetheless urged the hearing justice to look to extrinsic evidence "to aid in the interpretive process and to assist [the court] in determining the contract's meaning"—an exercise the hearing justice deemed unnecessary and impermissible. In his memorandum to the hearing justice, Karl contended that the contract was not ambiguous because plaintiff's interpretation was unreasonable as a matter of law and therefore "Karl's [i]nterpretation is the one valid interpretation of the contracts that are before the court." According to Karl, the contract "should be enforced according to the single, reasonable interpretation that gives meaning, life and effect to the [c]redit [p]rovision." However, to reach "the single, reasonable interpretation" of the contract and give "meaning, life and effect to the [c]redit [p]rovision[,]" one must venture upon a journey that is foreign to our jurispru-

---

18. Carolyn's grandson, David Haffenreffer, Jr., also returned a response indicating his desire to purchase parcel (i); Karl subsequently prevailed in a lottery as set forth in the will, and his acceptance was controlling.

19. David argues that Karl previously had expressed his intention to purchase parcel (ii) for $93,100 and, according to David, had no interest in purchasing parcels (i) and (iv).

dence and extends far beyond the borders of our law.

The hearing justice refused to engage in the fact-finding that Karl advocated; she found the contract's language to be clear and unambiguous and refused to resort to the analysis of extrinsic evidence. She correctly declared:

"As an initial matter, the Court finds Defendant's urged reading of the credit provision—so as to include the trust estate—to be an unreasonable interpretation of the actual language employed by the parties. The 'credit provision' clearly contains the phrase 'pursuant to the terms of the will.' The decedent's will and trust are distinct creations, each possessing independent legal significance. To accept Defendant's contention would not only require this Court to read an ambiguity in the agreement which, as previously noted, does not exist, it also would compel the Court to ignore the contractual language employed and essentially rewrite the agreement. The Court declines to do either."

Thus, the hearing justice gave effect to all of the provisions of the credit provision (including the prohibition against seller financing) and paid faithful allegiance to our pronouncements. In reversing her decision, the majority ignores most of the language in the Offer Document and rewrites the agreement in favor of Karl. In so doing, the majority declares that "it is our conclusion that the phrase 'Estate of Carolyn B. Haffenreffer' as used in the credit provision of the Offer Document unambiguously refers to Carolyn's Overall Estate." Thus, the term "estate" becomes "Overall Estate" and the remainder of the document, including the requirement that any credits must be due "pursuant to the terms of the Will" is ignored. According to the majority, because the will directs that the residue of the estate be trans-

ferred to the trust, the will and the trust "become inextricably linked" and are incorporated by reference into the credit provision and thus considered in the construction of the contract. I respectfully dissent.

## Analysis

### Interpretation of the Offer Document

#### Rhode Island Contract Interpretation Doctrines

Last term, this Court expressed Rhode Island's long-standing contract interpretation doctrines in *Young v. Warwick Rollermagic Skating Center, Inc.*, 973 A.2d 553 (R.I.2009), and today, less than one year later, the majority departs from these venerable doctrines.

The first step of contract interpretation is to determine whether the writing is clear or ambiguous. "A contract is ambiguous when it is 'reasonably susceptible of different constructions.'" *Young*, 973 A.2d at 558 n. 6 (quoting *Westinghouse Broadcasting Co. v. Dial Media, Inc.*, 122 R.I. 571, 579, 410 A.2d 986, 991 (1980)). "In determining whether or not a particular contract is ambiguous, the court should read the contract 'in its entirety, giving words their plain, ordinary, and usual meaning.'" *Id.* at 558 (quoting *Mallane v. Holyoke Mutual Insurance Company in Salem*, 658 A.2d 18, 20 (R.I.1995)); *see also Irene Realty Corp. v. Travelers Property Casualty Company of America*, 973 A.2d 1118, 1122–23 (R.I.2009). Importantly, we have oft said that "while carrying out this task, the court should 'refrain from engaging in mental gymnastics or from stretching the imagination to read ambiguity * * * where none is present.'" *Young*, 973 A.2d at 559 (quoting *Mallane*, 658 A.2d at 20); *see also Paul v. Paul*, 986 A.2d 989, 993 (R.I.2010) (recognizing that to a skilled advocate, "ambiguity lurks in

every word, sentence, and paragraph * * * [so] the question is not whether there is an ambiguity in the metaphysical sense, but whether the language has only one reasonable meaning when construed * * * in an ordinary, common sense manner") (quoting *Garden City Treatment Center, Inc. v. Coordinated Health Partners, Inc.,* 852 A.2d 535, 542 (R.I.2004)).

In *Young,* this Court was faced with interpreting an insurance release document. The document provided that the plaintiff, in exchange for monetary compensation, would release the defendant from injuries and damages *"in any way growing* out of *any personal injuries,* whether known or unknown to me at the present time resulting or to result from *any and all incidents or injuries occurring during my employment* [.]" *Young,* 973 A.2d at 556. This Court stated that, "[the release] is replete with such straightforward English words as 'any' and 'all.' " *Id.* at 559. "In view of our conclusion as to the unambiguous nature of the release language, there is no reason not to accept the release document and apply it at face value." *Id.* We properly recognized that "[i]f the contract terms are clear and unambiguous, judicial construction is at an end for the terms will be applied as written." *Id.* (quoting *Rivera v. Gagnon,* 847 A.2d 280, 284 (R.I.2004)); *see also Monahan v. Girouard,* 911 A.2d 666, 672 (R.I.2006) (recognizing same).

We acknowledged that while the plaintiff had the right to assert her position:

"the mere fact that parties differ as to the meaning of an agreement does not necessarily mean that the agreement is in fact ambiguous. *See City Investing Company Liquidating Trust v. Continental Casualty Co.,* 624 A.2d 1191, 1198 (Del.1993) ('[T]he language of an agreement * * * is not rendered ambiguous simply because the parties in litigation

differ concerning its meaning.')." *Young,* 973 A.2d at 560.

Ultimately, we refused to give credence to the plaintiff's version of what the written contract meant because when "we are confronted with unambiguous contractual words, what is claimed to have been the subjective *intent* of the parties is of no moment." *Young,* 973 A.2d at 560 (citing *Vincent Co. v. First National Supermarkets, Inc.,* 683 A.2d 361, 363 (R.I.1996)). In my opinion, that is the case currently before us—we are asked to consider and then elect between the subjective intent of the parties.

Most importantly to the case at bar, this Court acknowledged that "[i]n situations in which the language of a contractual agreement is plain and unambiguous, its meaning should be determined without reference to extrinsic facts or aids." *Young,* 973 A.2d at 560 (quoting *Clark–Fitzpatrick, Inc./Franki Foundation Co. v. Gill,* 652 A.2d 440, 443 (R.I.1994)); *see also National Refrigeration, Inc. v. Standen Contracting Co.,* 942 A.2d 968, 972 (R.I. 2008) (recognizing that "[b]ecause this contract language is clear and unambiguous, reference to extrinsic evidence is not necessary").

## Application of the Doctrines to the Credit Provision

I agree with the majority on one point— the language of the credit provision is not *reasonably* susceptible of more than one meaning; it clearly and unambiguously mandates that the parties can use shares that are due from the estate *pursuant to the terms of the Will.* The majority essentially contends that the phrase "pursuant to the terms of the Will" actually means pursuant to the terms of the trust. The majority reaches this conclusion by: (1) looking at some of the terms of the Offer Document containing the credit provision;

(2) determining that the credit provision is clear and unambiguous; *and then* (3) referring to extrinsic evidence in order to establish the parties' intent—an issue concerning which the parties strenuously disagree.[20] The majority then resolves this disagreement in Karl's favor, a result that flies in the face of *Young* and this Court's settled jurisprudence.

I also respectfully disagree with that portion of the majority opinion in which the Court declares that "we believe it worthwhile to note that our interpretation of the credit provision as unambiguously allowing Karl to use as a credit his shares from Carolyn's Overall Estate is entirely consistent with the intentions of the parties in preparing the Offer Document, as reflected in the copious extrinsic evidence in the record." Thus, as support for its conclusions, the majority proceeds to consider some, but not all, of the massive and confusing record that Karl produced. The opinion wholly overlooks the fact that the other parties, and the independent coexecutor, deeply and vigorously dispute Karl's declared intent with respect to the Offer Document. Moreover, when faced with a clear and unambiguous writing, "what is claimed to have been the subjective *intent* of the parties is of no moment." *Young*, 973 A.2d at 560, 560 n. 11 (recognizing that "[a] court's proper role in interpreting a contract is to divine 'the intent that is expressed in the language of the contract' ") (quoting *Westinghouse Broadcasting Co.*, 122 R.I. at 581 n. 10, 410 A.2d at 991 n. 10).[21]

In this case, David, Karl, and the independent coexecutor agreed on the terms of the credit provision that was designed solely for the benefit of the brothers Haffenreffer. As reflected in the writing, each was permitted to use credits for

**20.** In his brief to this Court, David insists that neither he nor, significantly, coexecutor Field retreat from their position that the Offer Document did not allow Karl to apply a credit against amounts due under the trust.

**21.** Rhode Island law is clear on this point. *See, e.g., Cathay Cathay, Inc. v. Vindalu, LLC*, 962 A.2d 740, 746 (R.I.2009) (recognizing that it "is a clear misstatement of the applicable law" when the trial justice determined that the parties' intent was as important as the contractual language because "[t]he language employed by the parties to a contract is the best expression of their contractual intent, and when that language is 'clear and unambiguous, words contained therein will be given their usual and ordinary meaning and the parties will be bound by such meaning' ") (quoting *Singer v. Singer*, 692 A.2d 691, 692 (R.I.1997) (mem.)); *Sturbridge Home Builders, Inc. v. Downing Seaport, Inc.*, 890 A.2d 58, 66 (R.I.2005) (the intent of the contracting parties "is only that expressed in the instrument and *not some undisclosed intention that the parties may have had in mind* ") (quoting *Wayne Distributing Co. v. Schweppes U.S.A. Ltd.*, 116 R.I. 108, 111 n. 2, 352 A.2d 625, 627 n. 2 (1976)); *Dovenmuehle Mortgage, Inc. v. Antonelli*, 790 A.2d 1113, 1115 (R.I.2002) ("clear and unambiguous language set out in a contract is controlling in regard to the intent of the parties to such contract and governs the legal consequences of its provisions") (quoting *Burke v. Potter*, 771 A.2d 895, 895 (R.I.2001) (mem.)); *Elias v. Youngken*, 493 A.2d 158, 163 (R.I.1985) ("It is a fundamental principle of contract law, as well as being well settled in this state, that 'clear and unambiguous language set out in a contract is controlling in regard to the intent of the parties to such contract and governs the legal consequences of its provisions' ") (quoting *Chapman v. Vendresca*, 426 A.2d 262, 264 (R.I.1981)); *Dudzik v. Leesona Corp.*, 473 A.2d 762, 765 (R.I.1984) (stating "[c]lear and unambiguous language set out in a contract is controlling in regard to the intent of the parties to such contract and governs the legal consequences of its provisions"); *Flanagan v. Kelly's System of New England, Inc.*, 109 R.I. 388, 392–93, 286 A.2d 249, 251 (1972) ("clear and unambiguous language in a written contract is controlling as to the intent of the parties * * * not some undisclosed intent that may have existed in the minds of the contracting parties but the intent that is expressed by the language contained in the contract").

shares that were due to them under the terms of the will. There is no other cognizable reason for them to have included the phrase "pursuant to the terms of the Will." The majority's interpretation of the credit provision effectively ignores this phrase, or worse, transmutes it into the trust estate. *See Andrukiewicz v. Andrukiewicz*, 860 A.2d 235, 239 (R.I.2004) (noting that when ascertaining the meaning of contractual language, "every word of the contract should be given meaning and effect; an interpretation that reduces certain words to the status of surplusage should be rejected").

Words have meaning. The term "will" means "will;" it does not mean "overall probate and trust estate." The agreed-upon language of the Offer Document is clear, and our involvement, like that of the hearing justice, should stop. We have no warrant to wade into the sea of extrinsic evidence in an effort to gauge the parties' intent. Consequently, I dissent.

### Conclusion

For the foregoing reasons, I conclude that the credit provision of the Offer Document was clear and unambiguous. I would affirm the judgment.